UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILLIAM MANNO, On Behalf Of Himself And All Others Similarly Situated, And Derivatively On Behalf Of MAXAM ABSOLUTE RETURN FUND, L.P., <br><br> Plaintiff, <br><br> v. <br><br> MAXAM CAPITAL GP, LLC; MAXAM CAPITAL MANAGEMENT LLC; MAXAM CAPITAL MANAGEMENT LIMITED; and SANDRA L. MANZKE, <br><br> Defendants, <br><br> and MAXAM ABSOLUTE RETURN FUND, L.P.; <br><br> Nominal Defendant. | Civ. No. 1:10-cv-09260-LAP <br><br><br> JURY TRIAL DEMANDED |

## AMENDED CLASS ACTION AND DERIVATIVE COMPLAINT

Plaintiff William Manno, on behalf of himself and a class of all persons, other than the Maxam Defendants (defined below), who invested in the Maxam Absolute Return Fund, L.P. (the "Maxam Fund" or the "Fund") between May 30, 2006 through and including December 11, 2008 (the "Class Period"), and, derivatively, on behalf of the Maxam Fund, alleges upon personal knowledge as to himself and his own acts, and upon information and belief, based, *inter alia*, on the investigation made by and through his attorneys, which investigation, included, among other things: (1) a review of account statements, offering memoranda, communications, and other documents created by or relating to the Maxam Fund; (2) a review of complaints filed by: (i) the United States Government; (ii) the Securities and Exchange Commission ("SEC"), including in *SEC v. Bernard L. Madoff*, 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008) and *SEC v.*

*David G. Friehling*, 09 Civ. 2467 (S.D.N.Y. Mar. 19, 2009); (iii) other regulators; (iv) the various complaints filed by Irving H. Picard (the "Trustee"), the Trustee for the liquidation for Bernard L. Madoff Investment Securities LLC ("BLMIS"), including his December 8, 2010 complaint against the Maxam Defendants and others in *Picard v. Maxam Absolute Return Fund, L.P. et al.*, No. 10-05342-brl (Bankr. S.D.N.Y.) ("Trustee's Action"); and (v) the complaint filed by the Retirement Program for Employees of the Town of Fairfield, Retirement Program for Police Officers and Firemen of the Town of Fairfield, and the Town of Fairfield in *Retirement Program for Employees of the Town of Fairfield, et al. v. Bernard L. Madoff, et al.*, FBT CV 095023735 (Conn. Sup. Ct.) ("Fairfield Action"); and (3) a review of other publicly-available reports and interviews published in the financial press and information obtained by Plaintiff, as follows:

## <u>SUMMARY OF ACTION</u>

1.      Plaintiff William Manno is a purchaser and holder of limited partner interests in the MAXAM Absolute Return Fund, L.P., who witnessed his entire investment disappear less than two years after his first investment, when, on December 10, 2008, Bernard L. Madoff ("Madoff") confessed to running a Ponzi scheme of unprecedented proportions.

2.      As is now well known, on December 11, 2008, Madoff was arrested by federal authorities and both he and his investment firm, Bernard L. Madoff Investment Securities, LLC ("BLMIS"), were charged with securities fraud and other federal offenses by the SEC.  In addition, the United States Attorney's Office for the Southern District of New York charged Madoff with securities fraud and other felony counts.  On March 12, 2009, Madoff pleaded guilty to all of the 11 charges leveled against him and admitted that he had not made trades for

his clients since at least the early 1990s, despite telling investors that he was investing their funds using a "split-strike conversion strategy."[1]

3.    Unbeknownst to Plaintiff, the Maxam Fund was formed as a "feeder fund" to Madoff by Defendant Sandra L. Manzke ("Manzke"), who invested millions of her clients' funds with him.  Manzke's personal history with Madoff dates back to the early 1990's, when she, as the Chief Executive Officer ("CEO") of Tremont Capital Management, Inc. ("Tremont"), was introduced to Madoff and began to invest client money with him through the Tremont funds, which became some of the biggest feeder funds to Madoff.  After leaving Tremont, Manzke set out to form her own feeder fund, the Maxam Fund, and lobbied Madoff, who was no longer accepting new customers, until she obtained an account for the Fund.  In exchange for being granted an account, Manzke agreed to comply with all of Madoff's conditions, including not identifying him in the Fund's offering materials, and even allowed him to review and comment on the offering materials prior to their distribution to potential investors.

4.    Manzke and the other Maxam Defendants (defined below) then facilitated Madoff's fraud for years and perpetrated their own fraud on Plaintiff and the Class (defined below) by making materially false representations and omitting to disclose material information

---

[1] The "split-strike conversion strategy" allegedly involved: (i) the purchase of equity shares in select companies that were included in the blue-chip Standard & Poor's 100 Index ("S&P Index"); (ii) the simultaneous sale of "call" options, which give the investor the right to buy a stock at fixed prices; and (iii) the purchase of "put" options, which allows the investor to sell a stock at fixed prices.  Over time, Madoff claimed that he was using a larger "basket" of equity shares selected from the S&P Index, combined with put and call options on the S&P Index itself, rather than options on individual equity shares.  Madoff claimed to execute this "split strike conversion" strategy six to eight times per year, but, at some point, he purportedly began to exit the market at the end of every quarter and to put all the funds in U.S. Treasury securities.  In reality, however, Madoff operated a class Ponzi scheme, the split-strike conversion strategy was never implemented and Madoff never traded any stocks or options for any of the customers whose money he purported to manage.

they had in their possession.  The Maxam Defendants made materially false and misleading statements and concealed material facts in Maxam's private placement memoranda ("PPM"), and elsewhere, which prospective investors relied upon in deciding to invest in the Maxam Fund. The PPMs failed to disclose to potential investors that the Maxam Fund was created for the express purpose of investing the Fund's assets with Madoff; that 100% of the Fund's assets were handed over to Madoff, who was the sole investment manager, broker-dealer, and custodian of the assets, without any investigation and oversight, without verifying Madoff's transactions or determining whether he was carrying out the Fund's investment strategy, and without ensuring the safety of the Fund's assets.  The Maxam Defendants also failed to disclose that they had not and would not conduct promised due diligence on Madoff, the Fund's unidentified "broker dealer," and affirmatively misrepresented the due diligence they did and would conduct.  They knew but failed to disclose that Madoff's operation was shrouded in secrecy and that his trading strategy was a veritable "black box" such that any due diligence and independent verification of his trading was entirely impossible.

5.    Moreover, the Maxam Defendants, as experienced and eminently qualified investment professionals, and as a result of Manzke's long-standing history with Madoff, had actual knowledge of numerous indicia of fraud that they had a duty to investigate and disclose to their investors.  The Maxam Defendants would have understood the following known warning signs to be contrary to sound investment management and, in certain cases, contrary to Madoff's own stated investment strategy:

- Madoff's operations were entirely opaque and the top positions in BLMIS were filled by Madoff family members;

- Madoff insisted on extreme secrecy and refused to have his name disclosed in the Maxam Fund's offering documents;

- BLMIS acted as broker dealer, investment advisor and custodian, when these three roles are generally separated in order to safeguard assets;

- Madoff operated his investment advisory business as part of BLMIS instead of as a standalone hedge fund;

- Contrary to industry practice, Madoff did not charge standard management and performance fees for the remarkable results purportedly generated by his trading strategy, and instead charged commissions on the alleged trading, depriving himself of hundreds of millions in readily collectible fees;

- Madoff reported consistent results regardless of market fluctuations even though he claimed to use a market-based trading strategy;

- Madoff reported implausible equities and options trading volumes;

- Madoff's consistent double-digit returns and his investment strategy could not be replicated by rival fund managers and other financial professionals;

- Madoff traded up to $30 billion in and out of the equities market without ever disrupting market prices;

- Despite being a pioneer of paperless trading, BLMIS did not allow customers real-time electronic access to their accounts, and instead sent them paper trade confirmations days after trades were purportedly made;

- Madoff refused to disclose the identities of his counterparties on his purported options trades; and

- BLMIS, which managed tens of billions of dollars as part of its domestic and international operations, was audited by an unknown three-person accounting firm in a strip mall.

6.     Defendant Manzke admitted on national television, in a May 12, 2009 "Frontline" interview on the PBS channel (the "Frontline Interview"), that she was "bothered" by certain things about Madoff, including that his massive operation was audited by a tiny accounting firm. She referred to Madoff's strategy as a "black box" and "that he wasn't going to disclose what was in it." Manzke also admitted that, as a condition of obtaining an account with Madoff, she agreed not to use his name in the Maxam Fund's offering documents. Elsewhere, such as in her July 7, 2009 Rule 2004 deposition before the Madoff Trustee's counsel, Manzke disclosed that she did not use Madoff's name in her funds' offering materials, listed BLMIS as a broker-dealer because Madoff was not a registered investment adviser, and agreed not to go "market[] like crazy" so Madoff would not draw excess attention. Despite all these things that "bothered" her, and the other warning signs that she and others at her organization knew, Manzke and the other Maxam Defendants published PPMs with the material omissions and misrepresentations set forth herein, and secretly invested millions of their clients' funds with Madoff with no due diligence, oversight or independent confirmation of his trading while collecting lucrative fees – more than $5.8 million, over a two-year period, according to the Madoff Trustee – for management services they did not perform.

7.     As a result of the Maxam Defendants' misconduct, 100% of the Maxam Fund's assets that the Maxam Defendants knowingly entrusted to Madoff without any oversight or due diligence have been wiped out. According to unaudited financials for the period January 1, 2008 through December 11, 2008, the Fund lost $265,323,936 to Madoff. During the life of the Fund,

the Maxam Defendants invested over $300 million of investor money into BLMIS, and redeemed almost $100 million between 2007 and December 11, 2008. During the 90-day period prior to December 11, 2008, Defendant Manzke withdrew $25 million from the Fund's account at BLMIS. These withdrawals are the subject of the Madoff Trustee's Action against the Fund and the Maxam Defendants, which action remains pending. The complaint in the Trustee's Action includes allegations based on deposition testimony from Defendant Manzke and internal Maxam documents, and is directly relevant to the allegations set forth herein and is discussed in greater detail below.

8.      Plaintiff now seeks to recover directly for damages caused by the Maxam Defendants': (1) violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"); (2) violations of Section 20(a) of the Exchange Act; (3) common law fraud; (4) negligent misrepresentation; (5) breach of fiduciary duty; (6) gross negligence and mismanagement; and (7) unjust enrichment. Plaintiffs also seek to recover derivatively, on behalf of the Maxam Fund, for damages caused by the Maxam Defendants': (1) breach of fiduciary duty; (2) gross negligence and mismanagement; and (3) unjust enrichment.

9.      Plaintiff further seeks to impose a constructive trust over all funds that may be paid by the Trustee to the Maxam Fund in connection with its claim under Securities Investor Protection Act ("SIPA Claim") as well as any assets still remaining in the Fund to prevent the Maxam Defendants from using those funds to: (a) pay any portion of the $2.63 million the Maxam Defendants agreed to pay to settle the Fairfield Action ( the "Fairfield Settlement"), pursuant to which Maxam Capital, Maxam GP, Maxam Capital Management Limited, Manzke, Walker Manzke, and April Manzke seek to extinguish their own liability, (b) to indemnify any of the Maxam Defendants in connection with the Fairfield Action or the Fairfield Settlement; (c) to

pay for the Maxam Defendants' attorneys' fees, costs and other litigation expenses in the Fairfield Action, the Trustee's Action, this action or any other action in which one or more of the Maxam Defendants is a party that arises from or relates to the investment of the Maxam Fund's assets with Madoff; and (d) pay management and/or administrative fees or any other remuneration to the Maxam Defendants.  Plaintiff also seeks injunctive relief enjoining the Maxam Defendants from utilizing any portion of the proceeds from the Maxam Fund's SIPA Claim or any assets left in the Maxam Fund to pay for any portion of the Fairfield Settlement, indemnify themselves or to cover their attorneys' fees, costs and other expenses of litigation, and from collecting accrued fees or other remuneration from the Maxam Fund.

## JURISDICTION AND VENUE

10.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated hereunder by the SEC, 17 C.F.R. § 240.10b.5, as well as under the laws of the State of New York.  This Court has jurisdiction in this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and pursuant to the supplemental jurisdiction of this Court.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act, 15 U.S.C. § 77u, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

11.     Venue is proper in this judicial district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v, Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of the alleged fraud and/or its effects have occurred within this District.

12.     In connection with the acts alleged in this Complaint, the Maxam Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but

not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

### Plaintiff

13.     Plaintiff William Manno, a resident of Florida, is a limited partner in the Maxam Fund.  Plaintiff invested approximately $200,000 on May 25, 2007, $200,000 on February 6, 2007, and $75,000 on August 29, 2008 in the Maxam Fund, all of which has been lost to Madoff's Ponzi scheme as a result of the Maxam Defendants' violations of the law.  Shortly after Madoff's arrest, on December 15, 2008, Plaintiff attempted to redeem the entire value of his account (equal to $518,017.91 as of November 30, 2008), upon written request to the Maxam Fund without success.

### Nominal Defendant

14.     Nominal Defendant MAXAM Absolute Return Fund, L.P., a limited partnership that was formed under the laws of Delaware on May 30, 2006, is a feeder fund to Madoff, with 100% of its assets invested with Madoff.  Its principal office is located at 16 Thorndal Circle, Darien, Connecticut 06820.  Limited partnership interests in the Maxam Fund were offered via the Private Offering of Interests Confidential Private Placement Memorandum, dated July 1, 2006 ("Initial PPM"), as amended and restated on March 21, 2008 by the Maxam Private Offering of Interests Amended And Restated Confidential Private Placement Memorandum ("Amended PPM") (collectively, referred to as the "PPMs").  In the Amended PPM, dated March 21, 2008, the minimum capital contribution was increased from $500,000 to $1,000,000, unless the General Partner determined a lower amount was acceptable.  Prior to the public exposure of Madoff's fraud, the Net Asset Value ("NAV") of the Maxam Fund (equal to its assets, at fair value, less its liabilities) was approximately $280 million.

**The Maxam Defendants**

15.     Defendant Maxam Capital GP, LLC ("Maxam GP") is a Delaware limited liability company organized on May 30, 2006, and located at 16 Thorndal Circle, Darien, Connecticut 06820.  Maxam GP is the General Partner of the Maxam Fund and engaged Maxam Capital as the Maxam Fund's investment manager.   As the General Partner, Maxam GP exercised ultimate authority over the Maxam Fund and was responsible for its day-to-day operations and management.  Maxam GP had the right to delegate all or any portion of its responsibilities to the Maxam Fund and, delegated its investment management responsibilities to Maxam Capital.   These responsibilities included: (1) making all decisions related to the investment of assets of the Maxam Fund; (2) managing all aspects of the investment of the Maxam Fund's assets including, without limitation, selecting Broker Dealers to which to allocate the Maxam Fund's assets, evaluating the broker dealers' performance and making all decisions with respect to allocating the Maxam Fund's assets; and (3) taking all such other actions which Maxam Capital considers necessary and advisable to carry out its investment management duties.  Maxam GP has a responsibility to the Maxam Fund and its investors to exercise good faith and fair dealing in all matters affecting the Maxam Fund.

16.     Defendant Maxam Capital Management LLC ("Maxam Capital") is a Delaware limited liability company located at 16 Thorndal Circle, Darien, Connecticut 06820.  Maxam Capital is an investment management firm formed in April 2005.  Maxam Capital is the Maxam Fund's investment manager, and, according to the Amended PPM, also became its administrator as of March 21, 2008.  (Prior to March 21, 2008, the Fund's administrator was Maxam Capital Management Limited ("MCML"), a wholly-owned subsidiary of Maxam Capital.)  Maxam Capital became registered with the SEC as an investment adviser in 2005 under the Investment

Advisers Act of 1940.  Upon information and belief, Maxam Capital had between six to ten employees and provided investment advisory services to somewhere between 11 and 25 clients. Its assets under management prior to the public discovery of the fraud totaled over $1 billion. Upon information and belief, Maxam Capital collected in excess of $5.8 million in management and administrative fees in connection with their direct and indirect investments through BLMIS. Maxam Capital has a responsibility to the Maxam Fund and its investors to exercise good faith and fair dealing in all matters affecting the Maxam Fund.

17.     Defendant Sandra L. Manzke ("Manzke") is a principal of Maxam GP, and Chairman, CEO and founder of Maxam Capital.  According to Maxam Capital's Form ADV, filed with the SEC on January 26, 2009, Manzke owns between 25% and 50% of Maxam Capital, and principal of Maxam GP.  Upon information and belief, she controlled both the operations and management of Maxam Capital.  In addition, Manzke served on the Investment Committee at Maxam Capital and is identified, in the Form ADV, Part II, which is part of the PPM ("Form ADV"), as a principal decision maker with regard to the Fund along with Joseph Soares and Suzanne Hammond, two of Defendants' former colleagues from Tremont.  From 2007 through the present, Maxam Capital paid Manzke $360,000, plus 30% profits in salary and other forms of compensation.  Manzke was recognized as a "Legend in the Hedge Fund Industry" by 100 Women in Hedge Funds in November 2002.  As described below, in addition to being an experienced and seasoned investment professional, Manzke also was a self-proclaimed industry "watchdog," policing managers whom she viewed as causing the general degradation of ethics in the industry and calling for greater transparency reform in the hedge fund industry.

18.     Defendants Manzke, Maxam Capital, and Maxam GP are sometimes collectively referred to herein as the "Maxam Defendants."

19.     Each of the Maxam Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on the Maxam Fund and/or its limited partners by their actions.

## SUBSTANTIVE ALLEGATIONS

I.     **THE MAXAM DEFENDANTS' WRONGDOING**

   A.     **Sandra Manzke's Relationship and History With Madoff**

      1.     **Tremont and Madoff**

20.     Defendant Manzke is a well-regarded and sophisticated professional in the investment management business with well over thirty years of experience. Manzke's extensive career began at Scudder, Stevens & Clark in 1969.  From 1974 to 1976, she worked as an independent consultant at Bernstein Macauley where she was responsible for reviewing the firm's products, and then moved on to Rogers, Casey & Barksdale, Inc., where she served as a principal from 1976 to 1984.  In October 1984, Manzke founded Tremont[2] where she was the firm's CEO.

21.     As described in the complaint in the Trustee's Action (the "Trustee's Complaint"), Defendant Manzke's long-standing history with Madoff dates back to her years at Tremont, one of the earliest consulting and advisory firms to focus on hedge funds.  The Trustee's Complaint alleges (upon information and belief) that Manzke first learned about Madoff through a colleague at Tremont, Leon Meyers, who had his own personal account with

---

[2] On December 7, 2010, the Trustee filed, under seal, a complaint in the United States Bankruptcy Court for the Southern District of New York against investment funds, affiliates and executives, including Defendant Manzke, associated with Tremont, the second-largest Madoff feeder fund.  In addition to seeking to recover fictitious profits, preferential payments and fraudulent transfers, the Trustee sought to recover additional payments to prevent any unjust enrichment on the part of Defendant Manzke and others, through fees and other payments received.

BLMIS at the time.  In the mid-1990s, Manzke entered into a business arrangement with Madoff and formed a limited partnership to act as a feeder fund to Madoff.  From then until 2005, when she left Tremont, Tremont collected hefty management and other fees for doing little more than soliciting investors and transferring their assets to Madoff who had complete discretion to manage the assets.

22.     While at Tremont, no significant due diligence was performed on Madoff.  As detailed in the Trustee's Complaint, prior to investing with BLMIS, Tremont reviewed Meyers's account statements to determine his rate of return and reviewed BLMIS trade confirmations to obtain a sense of Madoff's performance and strategy.  Manzke herself also purportedly met with Madoff in 1991 and viewed his business operations but could not recall any of the specific details of that meeting other than discussing Madoff's market-making side of the business.

23.     In fact, in press releases associated with the filing of the Trustee's Action against the Tremont defendants, the Trustee stated that: "Tremont blindly relied upon Madoff to drive the funds' returns and, more importantly, Tremont's profits . . . . The returns provided by Madoff helped Tremont grow into a large source of funds for BLMIS."  According to the press releases, Defendant Manzke, and others, were repeatedly warned and were on notice, through information in their own possession and publicly available, that the success of BLMIS could be the result of fraud but Defendants ignored obvious warning signs of fraud to maximize their own profits and self-interest.  In addition, the press releases stated that Tremont, its related entities and feeder funds did not conduct any reasonable or meaningful analysis regarding Madoff's performance, nor did they acknowledge significant operational deficiencies in Madoff's organization, even though BLMIS's compensation and organizational structure deviated from well-established industry practices.   The Trustee's Complaint alleges that Suzanne Hammond, Manzke's

colleague at Tremont who became the managing director of the Maxam Fund, criticized Tremont for not understanding Madoff's strategy or how to determine Tremont's dividends.

### 2.    Formation of the Maxam Fund and Maxam Entities

24.    In or about April 2005, Manzke left Tremont and founded Maxam Capital to provide investment advisory services to individual clients.  At that time, Manzke asked Madoff for a new BLMIS account, but he informed her that the Investment Advisory business within BLMIS was closed to new investors.  After being denied an account, Manzke persisted and, on her third try, Madoff agreed to allow her to open a BLMIS account, but only if she complied with his conditions.

25.    In 2006, Manzke formed the Maxam Fund for the sole purpose of creating a new source of fees for Maxam Capital, which she partly owned, by attracting investors with the impossibly steady and phantom returns purportedly generated by Madoff's investment strategy. The minimum subscription for investing in the Maxam Fund was initially $500,000, but was increased to $1 million, as set forth in the Amended PPM.  Manzke placed all of the assets of the Maxam Fund with Madoff.

26.    Once Manzke obtained an account with BLMIS, she willingly complied with all of Madoff's conditions and secrecy requirements including, *inter alia*: not disclosing his name in the Fund's PPMs or that he managed all of Maxam's assets; to list BLMIS as a broker-dealer because it was not a registered investment advisor; and not to go "market[] like crazy."  Manzke even permitted Madoff to review and comment on the Maxam Fund's offering documents before they were distributed to potential investors.

### 3.    The Structure of the Maxam Fund

27.    The Maxam Fund is a Delaware limited partnership that does not directly invest in securities listed on the national exchanges.  Participation in the Maxam Fund was offered

initially through the Initial PPM, dated July 1, 2006, which was subsequently amended and restated by the Amended PPM on March 21, 2008.

28.     According to the Fund's Limited Partnership Agreement ("LPA"), the "Partnership is organized for the purposes of generating capital appreciating by utilizing the strategies discussed in the [Fund's PPM], and in particular by allocating the Partnership's assets to third party broker dealers (each, a "Broker Dealer") who will invest such assets, and engage in all activities and transactions as the General Partner may deem necessary or advisable." According to the Fund's PPM, the Fund's investment objective is "long term capital appreciation with low volatility."

29.     The General Partner of the Maxam Fund is Maxam GP, which prepared the Initial PPM and the Amended PPM.  As described above, Maxam GP had the duty to oversee all of the day-to-day operations of the Partnership, including providing the Limited Partners with annual reports and additional information such as an income statement of the Partnership.  Maxam GP had the authority to delegate certain of its responsibilities, such as the responsibility to provide investment advisory, management, administrative, and auditing services.  Maxam GP engaged Maxam Capital to be the investment manager of the Fund.

30.     Maxam Capital was authorized, pursuant to the Investment Management Agreement between Maxam Capital and Maxam GP, dated July 1, 2006, to manage the affairs of the Maxam Fund.  As detailed in the Madoff Trustee's Complaint, Maxam Capital also executed an Investment Advisory Agreement and an Investment Policy Statement, dated June 29, 2007 and July 1, 2007, respectively, setting forth its duties and obligations as adviser to the Maxam Fund.  Under the Advisory Agreement, Maxam Capital agreed to provide investment advisory and supervisory services with respect to the planning, evaluating and monitoring of its clients'

assets, consistent with the investment objectives of its clients.  It further stated that it would "recommend, in good faith and a best efforts basis," managers that it believed would comply with the investment guidelines.  Maxam Capital further represented in its Advisory Agreement that it would perform its duties and obligations "with the care, skill, prudence and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims," and that Maxam Capital "has a fiduciary responsibility" to the Maxam Fund and its limited partners.

31.     According to the PPMs, Maxam Capital, as the investment manager of the Maxam Fund, is paid a monthly management fee in arrears equal to 0.083% of the NAV of each Limited Partner's Capital Account.  The management fee is assessed on a pro rata basis for a Limited Partner's actual period of ownership during a calendar month.  The annual rate is approximately 1%.  From the start of the Maxam Fund to the ultimate collapse of Madoff's scheme, Maxam Capital collected in excess of $5.8 million in management and administrative fees.

32.     The administrator of the Maxam Fund, initially MCML, and subsequently Maxam Capital, executed an Administrative Services Agreement with Maxam GP under which it had various responsibilities, including: "calculating valuations using independent pricing sources," "maintaining books and records," "calculating all Partnership fees," "preparing periodic financial statements," "calculating and disseminating the NAV of the Partnership," and performing other services.

33.     Further, the administrator of the Maxam Fund, MCML (and subsequently, Maxam Capital), is paid an annual administration fee equal to 0.20% of the NAV of each

Limited Partner's Capital Account.  The administration fee is assessed on a pro rata basis for a Limited Partner's actual period of ownership during a calendar month.

34.     Pursuant to the LPA, a capital account was established for each Limited Partner and reflected each Limited Partner's interest in the Maxam Fund.  The opening balance of the capital account is the Limited Partner's initial contribution, but can be further adjusted in accordance with the principles set forth in the controlling partnership agreement.  The aggregate amount of any and all management fees payable is charged to that Limited Partner's capital account, and any net capital appreciation or depreciation is allocated to all Limited Partners in proportion to each Limited Partner's ownership percentage.

35.     According to the PPMs, Limited Partners are permitted to make partial or total redemptions, upon 35 days written notice to the General Partner, as of the last business day of each calendar month or at such other times as the General Partner determined in its absolute discretion.  The PPMs further provided that "Limited Partners will have no right or power to take part in the management of the Partnership, nor in any decision with regard to the allocation of management of the Partnership's assets."  Thus, the Limited Partners were dependent on the Maxam GP, "who has complete authority and discretion in the management and control of the business of the Partnership," to make sound investment decisions with respect to the Maxam Fund's assets.

### 4.     The Life of the Fund and its Collapse

36.     Throughout the life of the Fund, limited partners received monthly Investor Statements showing assets in their capital accounts and financial statements for the Fund showing assets in the Fund, and Maxam Capital collected in excess of $5.8 million in management and administrative fees despite the fact that all of the Fund's assets were invested with Madoff who was operating a Ponzi scheme.

37.    Shortly before Madoff's December 2008 confession, Defendant Manzke asserted in a letter to hedge fund investors, which was quoted in a November 21, 2008 New York Post article, that she was "appalled and disgusted by the activities of a number of hedge fund managers," especially those "attempting to get their money out ahead of investors."  She called for greater transparency in the hedge fund industry and called investors to join with her to reform the industry.

38.    The letter was a preemptive strike that Manzke could use in defending her actions to investors in the Maxam Fund, who she knew would soon learn of the true value of their investments in the Maxam Fund – zero.

39.    During this same period, Manzke, however, was responsible for the Maxam Fund's successful withdrawal of two $5 million transfers and one $15 million transfer within the 90-day period prior to December 11, 2008.  In fact, within the two years prior to December 11, 2008, Manzke withdrew approximately $97.8 million in redemptions from Madoff.  The $25 million, which was withdrawn within 90 days prior to Madoff's arrest, was transferred to Maxam Absolute Return Fund Ltd. ("Maxam Limited"), an offshore fund that was an investor in the Maxam Fund, to distribute to its foreign investors.

40.    Manzke called for heightened protection of investors in the industry against managers whose main concern was their own personal gain.  Yet, at the same time, Manzke's very own actions and abandonment of her duties assisted, enabled and helped to sustain for almost 15 years, the single largest investor fraud in history.

41.    On December 12, 2008, after Madoff's fraud was publicly exposed by virtue of his arrest, Manzke, on behalf of Maxam Capital, wrote to the Fund's limited partners, including Plaintiff, informing them that she was "shocked to learn that Madoff" may have been responsible

for "the largest Ponzi scheme in history by reporting fictional investment profits and using current investors' money to pay departing investors."  Moreover, the letter stated that they are "monitoring these [court] proceedings and are working to sort out the complicated legal issues arising from this unprecedented situation and determine what actions are appropriate under these circumstances."

42.     On or about December 12, 2008, the Maxam Fund effectively ceased operating as an investment fund, and its operations subsequent to that date have been directed primarily towards winding up operations.

43.     According to the Trustee's Complaint, on December 16, 2008, four days after Madoff's arrest, Manzke transferred a one-half ownership interest in her home located in Pound Ridge, New York, to her son Walker and his wife April.  The remaining one-half ownership interest was transferred to Walker and April, through the Sandra L. Manzke Revocable Trust ("Manzke Trust"), for which Manzke is the sole trustee, leaving Walker and April with full ownership of the $1.8 million property.

44.     In order to further divert attention from the Maxam Defendants' own wrongdoing, on January 30, 2009, Manzke, on behalf of the Maxam Fund, sued the Maxam Fund's auditors, McGladrey & Pullen LLP and Goldstein Golub Kessler, purportedly to protect the Maxam Fund's interests, and to pursue claims on behalf of the Maxam Fund, for ignoring the very red flags that the Maxam Defendants itself knowingly ignored (the "Maxam Auditor Action").

45.     In the months following Madoff's confession, the Maxam Defendants sent regular update letters to their investors, assuring them that the Maxam's primary goal was to ensure that whatever steps would be taken would be in the best interests of the Maxam Fund's investors.  On January 6, 2009, the Maxam Defendants wrote to their investors notifying them that they

engaged the New York-based litigation firm of Kobre & Kim LLP ("Kobre & Kim") "to pursue all available options for recovery." The Maxam Defendants further stated that "Kobre & Kim LLP is investigating and developing potential lawsuits against third-parties in an effort to return value to our investors."

46.     However, upon information and belief, the law firm hired by Manzke, Kobre & Kim, has not pursued "all available options for recovery" for the benefit of the limited partners of the Fund. Rather, Kobre & Kim has served to defend Manzke, the Maxam Defendants, and Manzke's family members in the various pending lawsuits filed against them including, *inter alia*, the present action, the Trustee's Action, the Fairfield Action, and others.

47.     Moreover, the PPMs and the Investment Management Agreement contain indemnification provisions, which provide for the indemnification of the Maxam Defendants against liabilities to third parties, including reasonable attorneys' fees, cost and expenses incurred in connection with the defense of actions or proceedings. Upon information and belief, rather than seeking to maximize and recover the Maxam Fund's assets for the benefit of its investors, the Maxam Defendants are dissipating the Fund's assets to defend their own wrongdoing. As set forth below, the Maxam Defendants and related entities, and Manzke's son and daughter-in-law, as part of the Fairfield Settlement, have agreed to pay plaintiffs in the Fairfield Action up to $2.63 million plus interest out of any monies received by the Fund on its SIPA Claim.

**B.     The Maxam Defendants' Misrepresentations and Omissions**

48.     Manzke created the Maxam Fund for the sole (albeit undisclosed) purpose of investing the Fund's assets with Madoff and thereby profiting from Madoff's impossibly steady double-digit returns. With that objective in mind, the Maxam Defendants solicited investors and

sold limited partnership interests in the Maxam Fund through the use of materially false statements and omissions of material fact in the Initial PPM and the Amended PPM.

### 1. The Maxam Defendants Knew But Failed To Disclose Madoff Would Be The Sole Manager Of The Fund's Assets

49.    Manzke lived up to her end of the bargain and did not use Madoff's name in the Maxam PPMs and other offering documents.  The Maxam PPMs state that "[c]urrently there is only one Broker Dealer trading in the Partnership's assets on a discretionary basis," but do not disclose that the "Broker Dealer" is BLMIS.  Nor do the Maxam PPMs disclose that the "Broker Dealer" actually was acting as an investment adviser and that Manzke, as a condition of obtaining an account with Madoff, agreed to identify BLMIS as a broker-dealer because it was not registered as an investment advisor.  The PPMs omit the material fact that Madoff was not just serving the role of a mere "Broker Dealer" but he was, in fact, the sole investment manager of 100% of the Maxam Fund's assets.

50.    Moreover, the Maxam Defendants failed to disclose the material fact that they invested all of the Maxam Fund's assets with Madoff without any oversight, due diligence, or independent verification of his trading or strategy.  The Maxam Fund's Amended PPM misleadingly states that Maxam GP delegated its investment management responsibilities to Maxam Capital, which was responsible for "manag[ing] all aspects of the Partnership's investment operations in accordance with all investment parameters adopted by the Partnership" and "for allocating assets among the various Broker Dealers and monitoring their performance." The PPM further provides that Maxam Capital would charge and receive monthly management fees for its purported investment management services to the Partnership.   The same representations appear in the Initial PPM.

51.     This representation is utterly false because it created the false impression that Maxam Capital was actively managing the investments of the Maxam Fund, when, instead, all that it (and Manzke) did was hand over the Partnership's assets to Madoff, without determining whether he was complying with the Fund's "investment parameters" and without monitoring his performance.

52.     Further, the Maxam Defendants knew, but intentionally did not disclose the things that "bothered" Manzke about Madoff, and the warning signs that, as experienced investment professionals, the Maxam Defendants knew were indicia of fraud.   Among other things, the PPMs did not disclose Madoff's insistence on extreme secrecy, that the lack of transparency meant that Maxam Capital did not and would not conduct due diligence on Madoff, that Manzke herself, since her days at Tremont, had repeatedly been warned and was on notice that the reported success of Madoff could be the result of fraud, that she was bothered by the "tiny" size of the accounting firm Madoff used, and that she did not understand his proprietary "black box" trading strategy.   Further, Manzke and the Maxam Defendants knew that BLMIS functioned as investment advisor, executing broker, and custodian of securities but did not disclose this fact in the PPMs or the dangers of such an arrangement.   As experienced investment professionals, the Maxam Defendants knew but failed to explain to their investors that the separation of these three roles serves as a key risk control measure in safeguarding customer assets.

> **2.     The Maxam Offering Documents Contained False and Misleading Statements About the Maxam Fund's Investment Objective and Broker Dealer Selection Process**

53.     The Maxam PPMs state that the Maxam Fund's investment objective is to seek "long term capital appreciation with low volatility. The Investment Manager attempts to achieve the objective by allocating the Partnership's assets to Broker Dealers who will invest such assets in equity securities, options strategies and other equity related derivatives."

54.     These statements are materially false and misleading because they conveyed the false impression that Maxam GP and Maxam Capital were investing the Maxam Fund's assets in a manner to seek "long term capital appreciation with low volatility," when they were really entrusting all of the Partnership's assets to one unregistered investment manager – Madoff – whose investment strategy Manzke admitted was a "black box, that he used, that he wasn't going to disclose what was in it."   Because the Maxam defendants did not know or understand Madoff's trading strategy, they could not have known whether Madoff was pursuing the Fund's investment objective.

55.     The Maxam PPMs further gave the false impression that the Maxam Defendants were utilizing a selective process by which they selected Broker Dealers to trade the Fund's assets.  According to the Amended PPM, in selecting its Broker Dealers, Maxam Capital: "may also consider such factors as price, the ability of the Broker Dealers to effect transactions, as well as the Broker Dealer's facilities, reliability and financial responsibility.   Accordingly, if the Investment Manager determines in good faith that the amount of commissions charged by a Broker Dealer is reasonable in relation to the value of the foregoing, the Partnership may pay commissions to such Broker Dealer in an amount greater than the amount another broker might charge."

56.     This statement was false and misleading because the Maxam Defendants considered none of these factors in selecting Madoff to manage all of the Fund's assets.  Instead, after obtaining a coveted account with BLMIS, Maxam Capital, through Manzke, simply handed over the Fund's assets to Madoff, unconditionally, as she had done since the mid-1990's when she was at Tremont, without any due diligence and oversight.

57.     Further, Maxam Capital could not have considered price and the ability of the Broker Dealer to effect transactions because Madoff was not effecting transactions, and Maxam Capital did nothing to verify there were transactions.  Maxam Capital could not have considered Madoff's facilities, reliability and financial responsibility, because, as Manzke knew, Madoff would not allow due diligence and his operation was entirely opaque.  Instead, Manzke complied with Madoff's "Don't Ask, Don't Tell" policy, and blindly turned over Maxam's assets to Madoff despite having actual knowledge of the warning signs of Madoff's potential fraud.

### 3.     The Maxam Defendants Misrepresented That The Maxam Fund's Investments Would be Diversified When They Knew They Were Not

58.     The Maxam Defendants also knowingly and willfully misrepresented the diversification of the Maxam Fund, which they stated in the PPMs would be restricted, so that the Fund "will invest no more than 20% of the value of its total assets (at the time of investment) in the securities of any one issuer."  In reality, the Maxam Defendants simply handed over 100% of the Maxam Fund's assets to Madoff without any oversight or monitoring.

59.     Because the Maxam Defendants failed to conduct oversight or independently verify Madoff's transactions, they did not know whether Madoff was complying with the Maxam Fund's 20% diversification requirement.  In fact, because Madoff claimed to be placing 100% of the Fund's assets into Treasuries at the end of each quarter, the Maxam Defendants could not know whether he was complying with the Fund's diversification requirements.

60.     The only reason for the Maxam Defendants to make this statement was to convince prospective investors that their assets would not be over-concentrated in one investment so as to avoid the risk of losses if that particular investment lost value.  The Maxam Defendants knew that they were placing 100% of the Maxam Fund's assets with Madoff who made all of the investment decisions.   These misrepresentations and omissions were not

accidental, but were intended to make the Maxam Fund appear to be a secure and diversified investment vehicle when the Maxam Defendants knew it was not.

61.     Similarly, in the LPA, the Maxam Defendants represented that the purposes of the Fund include, *inter alia*, "to invest and reinvest the Partnership's assets from time to time, within a broad range of financial instruments, securities, and transactions" and "to utilize a variety of investment techniques including, but not limited to, short selling, purchase and sale writing of options on securities." These statements, of course, were false and misleading because the Maxam Defendants selected a single investment advisor with a single investment strategy, which Manzke called a "black box," and conducted no independent verification of his trading. They had no way of knowing whether Madoff was, in fact, investing the Fund's assets in "a broad range of financial instruments, securities, and transactions."

### 4.     The Maxam PPMs Contained False and Misleading Statements About the Maxam Defendants' Purported Due Diligence

62.     In order to lure investors, the Maxam Defendants consistently – and falsely – assured potential investors that they conducted a thorough and informed investigation of the investment managers they employed. These representations were false and misleading. The Maxam Defendants clearly failed to conduct adequate, if any, due diligence on Madoff because, among other things, Manzke did not want to endanger the lucrative income stream from investing the Maxam Fund's assets with Madoff.

63.     In her "Frontline" Interview, Manzke admitted that even though she was a champion of openness and transparency in the hedge fund industry, she applied different standards when it came to Madoff:

> MARTIN SMITH: [voice-over] Manzke says everyone operated by Madoff's
> secrecy rules.

[on camera] Did Madoff say to you, 'Don't put me in your prospectus?'

SANDRA MANZKE: Yes. He did.

MARTIN SMITH: Do you think that's right? Do you think that's appropriate?

SANDRA MANZKE: I don't know. Every one of my clients knew that this was a Madoff feeder fund, and-

MARTIN SMITH: So why not put it in a prospectus, then?

SANDRA MANZKE: That was one of, always, Bernie's conditions of getting an account.

MARTIN SMITH: But you've publicly called for transparency. That's transparency.

SANDRA MANZKE: Yes. But many funds and investors were very secretive. They didn't mention that they had money with Madoff. It was something you didn't talk about.

64.     Thus, Manzke violated her own rules of transparency to accommodate Madoff's conditions to investing.  As alleged by the Trustee, Maxam Capital, however, told investors in its Due Diligence Questionnaire that it "[did] not invest in secretive managers or in managers whose strategy we do not understand . . . . We are extremely transparent with clients in regard to the in-house qualitative and quantitative information generated by our analysis."  This was patently untrue.

65.     Similarly, Maxam's Form ADV dated March 5, 2008 falsely represented that:

MAXAM recommends investment advisors to its clients and makes and/or recommends investments in private placement vehicles.  In this process, MAXAM's staff evaluates investment management organizations.  MAXAM analyzes, in detail, the philosophy, investment professionals, decisional processes and performance of the organization and the investment products offered.  MAXAM's staff also visits investment organizations to evaluate back office operations and internal staff, among other things.

66. This statement is false and misleading and omits the material fact that Manzke created the Maxam Fund solely to invest with Madoff, that she did not rely on the "underlying investment managers reports and documents," including PPMs, to invest with Madoff, and neither Defendant Manzke nor any of the other Maxam Defendants could have visited "investment organizations to evaluate back office operations and internal staff" because Madoff's operation was shrouded in secrecy.

67. The Form ADV further represented that Maxam Capital used other strategies to conduct due diligence, which included:

> ...utiliz[ing] databases, wire services, performance measurement publications and other business journals as information sources. MAXAM has a license to utilize the information included in Pertrac, and Eurekahedge databases. In addition, MAXAM sources data on new investment organizations through referrals by other investment managers, its clients and financial service providers. MAXAM relies on the underlying investment manager reports and documents (private placement memoranda, annual reports, shareholder reports and monthly and/or quarterly manager letters).

68. Had Maxam Capital used "performance measurement publications and other business journals as information sources," the Maxam Defendants could not have ignored – unless they were complicit – the significance of the warning signs they knew and that kept other hedge fund managers from investing their clients' assets with Madoff. As described below, *MARHedge* and *Barron's*, two prominent industry publications, featured articles doubting Madoff's legitimacy and his purported returns as early as 2001.

69. In a May 2001 article entitled "Madoff Tops Charts; Skeptics Ask How," Michael Ocrant, managing editor of *MARHedge*, a New York-based hedge fund publication, eyed Madoff's success with skepticism because of the unrealistic nature of Madoff's returns and their

consistency.   Specifically troubling to Ocrant was Madoff's determined reluctance to justify or explain his firm's strategy or success:

    (a)    "As for the specifics of how the firm manages risk and limits the market impact of moving so much capital in and out of positions, Madoff responds first by saying, 'I'm not interested in educating the world on our strategy, and I won't get into the nuances of how we manage risk.'   He reiterates the undisputed strength and advantages the firm's operations provide that make it possible."

    (b)    "The inability of other firms to duplicate his firm's success with the strategy, says Madoff, is attributable, again, to its highly regarded operational infrastructure.   He notes that one could make the same observation about many businesses, including market making firms."

    (c)    "Madoff, who believes that he deserves 'some credibility as a trader for 40 years,' says: 'The strategy is the strategy and the returns are the returns.'   He suggests that those who believe there is something more to it and are seeking an answer beyond that are wasting their time."

70.    In the same month, *Barron's* published an article entitled "Don't Ask, Don't Tell" discussing the remarkably steady returns purportedly achieved by Madoff.   The *Barron's* article discussed the belief of many hedge fund professionals and options strategists that Madoff could not achieve the returns he reported – an average annual return of 15% for the preceding decade – using the strategy that Madoff described.   In addition to the suspicious consistency of Madoff's high returns, the article discussed several other warning signs that suggested Madoff might be committing fraud, including Madoff's secrecy and the inability of "more than a dozen hedge

fund professionals, including current and former Madoff traders" to duplicate Madoff's returns using his strategy.

71.     Indeed, as set forth above, Defendant Manzke publicly admitted in the Frontline Interview that she knew of the warning signs other investment professionals saw and heeded, but invested with Madoff anyway.  When Manzke was asked in the Frontline Interview whether she was bothered by the tiny size of Madoff's accounting firm, she replied that *"[o]f course, it bothered you.  I mean, every - you know, those are the kind of things that it would bother you.* But that was one of the conditions of doing business, that you accepted that.  And part of that was his, you know, proprietary trading model, the *black box* that he used, *that he wasn't going to disclose what was in it.*"  (Emphasis added).

72.     As detailed in the Trustee's Complaint, however, certain of Maxam Capital's own due diligence materials state that Maxam Capital will follow up with a fund's contacts and "will speak directly with the fund administrator, prime broker, and auditor to make sure that the process described at the manager level are [sic] actually carried out by the third party service provider."  The Trustee alleged, on information and belief, that Maxam Capital did not speak with Friehling &Horowitz, BLMIS' auditor.  Elsewhere, Maxam Capital claims that "[i]f we are not comfortable with the business risks from this review, we can eliminate a manager from further consideration."  Maxam Capital also contended that it performed reference checks on third party providers and would "thoroughly review and analyze the manager's audited financial statements."  *Id.*  Maxam Capital did none of this, and the Maxam Defendants continued to benefit from Madoff's fraudulent scheme.

### 5.     False and Misleading Investor Statements Sent to Limited Partners

73.     In addition to the false and misleading statements in PPMs and Form ADVs, the Maxam Defendants also issued false and misleading monthly Investor Statements to Plaintiff and

other limited partners.  The Investor Statements reported market values of investments that were false because Madoff was operating a Ponzi scheme.  The Investor Statements showed assets that simply did not exist, including fictitious profits.  Plaintiff and members of the Class relied on these false Investor Statements to make additional purchases in their Maxam Fund investment accounts or to resolve not to sell, and continue to hold onto, their limited partnership interests.

74.     According to the Maxam Fund PPMs, the Maxam Fund's Administrator, Maxam Capital (prior to March 21, 2008, MCML), was responsible for, among other things, calculating valuations using independent pricing sources, reconciling case and portfolio positions, calculating all partnership fees, preparing periodic financial statements, and calculating and disseminating the NAV of the Fund.  As the Maxam Fund's Administrator, Maxam Capital was tasked with making sure that the Investor Statements, which were provided to all limited partners, were truthful and accurate.  Defendant Maxam Capital was, at minimum, reckless in sending these false Investor Statements to the Fund's limited partners without independently confirming the accuracy of the values therein.

C.     **The Maxam Defendants Ignored Known Warning Signs of Potential Fraud**

75.     The Maxam Defendants were experienced investment professionals and marketed themselves as such.  The marketing materials claimed that "six senior professionals" had "in excess of 100 years experience in the investment community" and that its "[s]enior professionals have been investing in hedge funds since 1985 and are recognized as leaders in this field." Maxam Capital's marketing materials also state that "[Maxam Capital] has established a strong compliance capability as part of its culture."  Maxam Capital also had an Investment Committee, which, among other things, was to provide information upon which investment and trading decisions concerning the Maxam Fund would be made, to participate in all aspects of manager research and due diligence, and to review all investment supervisory accounts at least monthly.

The Investment Committee boasted numerous sophisticated financial professionals, including Manzke, and some of her former colleagues from Tremont, such as, Suzanne S. Hammond, a managing director of Maxam Capital, who was a former Tremont executive responsible for Tremont's single manager (*i.e.*, Madoff) business; Joseph Soares, also a managing director of Maxam Capital, who was a former Tremont executive responsible for client reporting, manager monitoring and all portfolio operations; Catherine Sweeney, a former Tremont executive responsible for the comprehensive due diligence process on investment managers, reviewing, selecting, and recommending managers for Tremont's consulting clients; and Harvey Goldsmith, an experienced fund of funds manager.

76.    In fact, as alleged in the Madoff Trustee's complaint against the Maxam Defendants, a Maxam executive misled a skeptical potential investor, who ultimately decided not to invest in BLMIS, in an October 2008 email.  In that email exchange, the Maxam executive stated "I know from personal discussions with executive level people that [Madoff] is highly respected for his expertise and the businesses he built . . . We have spent considerable time with him and with others in his organization and are comfortable with the infrastructure and the manner in which he manages the Fund . . . We closely monitor his trades, his execution and his adherence to the stated strategy."

77.    This was, of course, completely false and no monitoring or independent confirmation of Madoff's trades or strategy was ever performed.

78.    According to the Trustee's Complaint, during her July 7, 2009 deposition before the Trustee's counsel, Manzke admitted that she did not ask Madoff why he was not charging a performance fee or why he self-custodied.  Nor could she adequately testify as to what she, as CEO of Maxam Capital or Tremont or anyone else at Tremont, did to independently verify the

checks and balances that BLMIS purportedly had in place to monitor its capital allocations. Rather, Manzke and the other Maxam Defendants were content to obtain a new BLMIS account, collect generous fees, and look the other way despite their knowledge of clear indicia of Madoff's fraud.

79.    As a result of their expertise and long-standing history with Madoff, the Maxam Defendants had actual and/or constructive knowledge of the following warning signs of potential fraud, which they ignored in order to line their own pockets.

### 1.    BLMIS Served As Custodian, Investment Manager and Broker

80.    BLMIS served the three functions of investment advisor, executing broker and custodian of securities, in contravention of an industry risk control mechanism by which the custodian of securities is generally independent of the investment manager.   The Maxam Defendants ignored this clear peculiarity and never verified that the securities Madoff purportedly purchased for them actually existed.

### 2.    Madoff Could Have But Did Not Charge Significant Management And Performance Fees

81.    In another deviation from well-established organizational and remuneration practices in the hedge fund industry, Madoff ran his investment adviser business as a division of his broker dealer, BLMIS.   Many other managers employing a specific investment strategy utilized a standalone hedge fund structure.

82.    In addition, Madoff's compensation structure was itself a red flag of potential fraud and used as an inducement for funds to keep feeding him billions.   While other hedge fund managers typically charge fees of 1% to 2% of assets under management, along with performance fees of 10% to 20% of profits generated for the fund, Madoff, in connection with his investment advisory services, charged only a four-cent per share "brokerage commission" for

each purported equity trade, and a $1 per option contract executed. According to the Trustee's Complaint, this highly atypical compensation arrangement between Madoff and Maxam Capital resulted in Madoff leaving anywhere from $6.8 million to $17 million on the table for the Maxam Fund between 2006 and 2008. Manzke testified that she believed BLMIS's investment advisory business had anywhere between $20 to $30 billion in assets under management, which means Manzke had to have known that Madoff's fee structure resulted in him giving up hundreds of millions of dollars that he could have collected, but did not.

83.     Because Madoff charged only brokerage commissions, in lieu of management or performance fees as fund managers typically did, the Maxam Defendants were able to keep more of the fees they collected. In fact, the Maxam Defendants reaped extraordinarily and suspiciously high rewards for providing little or no management services.

### 3.     BLMIS Utilized a Small Three-Person Audit Firm

84.     As Manzke knew, although Madoff managed tens of billions of dollars worth of assets, both domestically and internationally, BLMIS was audited by Friehling & Horowitz ("F&H"), a three-person accounting shop located in a strip mall in Rockland County, New York. Of those three persons, one was an assistant and one was a semi-retired accountant living in Florida.

85.     When asked during her "Frontline" interview whether she was at all bothered by the size of the accounting firm, Manzke admitted: "Of course, it bothered you. I mean, every – you know, those are the kind of things that it would bother you. But that was one of the conditions of doing business, that you accepted that."

86.     On March 18, 2009, the SEC charged David Friehling ("Friehling") and F&H with securities fraud for representing that they had conducted legitimate audits of BLMIS when they had not. Friehling pleaded guilty to these charges in November 2009.

### 4. Madoff's Reported Profits Were Unrealistically Consistent

87.     The Maxam Defendants knew that Madoff reported remarkably consistent returns even during periods of severe downturns in the equities market despite the fact that Madoff's purported split-strike conversion strategy was tied to the equities markets. If the Maxam Defendants had performed a basic and reasonable quantitative analysis used in the industry at the time of Madoff's purported returns based on this strategy, they would have realized that his consistent performance was so improbable as to be impossible.

### 5. The Volume of Madoff's Purported Options Was Impossible

88.     The Maxam Defendants knew or had constructive knowledge that the volume of Madoff's purported options trading was impossible if those option contracts had been exchange-traded because BLMIS reported a traded option volume that exceeded the corresponding volume for those contracts on the Chicago Board Options Exchange ("CBOE"). The Maxam Defendants could have and should have performed a simple review of the purported options trading volume against the CBOE volume. In fact, as discussed further below, Investment Advisor Ivy Asset Management Corp. ("Ivy"), did perform such a review and ultimately withdrew all of its proprietary funds from Madoff based on its grave suspicions regarding Madoff's options trading. That the Maxam Defendants did not confirms that no independent due diligence was ever performed on Madoff's trading activity.

### 6. Madoff's Purported Equities Trading Volume Was Implausible

89.     The Maxam Defendants knew that Madoff's reported equities trading volume was virtually impossible and should have conducted further inquiry. The Trustee's Complaint proffered a sampling of days where the intraday trading volume was insufficient for Madoff to achieve his purported transaction price. For example, on December 22, 2006, Madoff purported to sell 17,367 shares of JP Morgan Chase on behalf of the Maxam Fund at a price of $48.73 per

share.  However, on that day, only 6,900 total shares of JP Morgan were sold at or above the price of $48.73.  Again, on September 13, 2007, although Madoff purportedly purchased 22,816 shares of Verizon on behalf of Maxam Fund at a price of $42.16, only a total of 5,500 shares of Verizon stock were purchased on September 13, 2007 at or below that price.

### 7.       Madoff's Purported Trading Had No Effect on the Market

90.      The Maxam Defendants knew that Madoff moved between $20 to $30 billion into and out of the equities and options markets over the course of just a few days, which would have resulted in market reaction but Madoff's trades seemingly had no impact on the market.  Yet, the Maxam Defendants never independently investigated how Madoff could accomplish these trades without any impact on the price of the securities bought and sold, without any market footprint and without anyone knowing or hearing about his alleged trading activity.  Similarly, when Madoff purported to place his customers' assets in Treasuries, the activity of moving billions of dollars in and out of the market would have impacted the price of Treasuries.

### 8.       Madoff's Remarkable Ability
### to Make Trades At the Most Optimal Prices

91.      The trade tickets and account statements for BLMIS's purported purchases and sales for the Maxam Fund almost always appeared to occur at precisely the right time of day.  Specifically, for the majority of time when BLMIS was purportedly purchasing shares for the Maxam Fund, the reported purchase prices was below the daily midpoint price, and, conversely, the reported sale prices were generally above the daily midpoint price.  This regularity is particularly uncanny because, as explained by the Maxam Trustee, the Maxam Defendants would have known for Madoff to truly execute his split-strike conversion strategy by engaging in "time slicing" within a given day, this practice would have resulted in BLMIS's trades on behalf of the Maxam Fund being somewhere in the range of the daily midpoint price.

### 9.      Madoff Refused to Disclose the Identities
### of His Counterparties on Options Trading

92.     Madoff insisted on secrecy regarding the identity of the counterparties on the options transactions and would not disclose the identities of the counterparties to Manzke or others.    The Maxam Defendants simply accepted Madoff's vague descriptions of the counterparties and, in violation of their fiduciary duties, did not seek confirmation of the creditworthiness of the counterparties.

93.     As detailed in the Trustee's Complaint, the Maxam Fund entered into an agreement with BLMIS entitled "Terms and Conditions for Option Hedging Transactions," pursuant to which "(BLMIS) will effect, *as agent*, the client's transactions" (emphasis added). Under the terms of the agreement, as understood by the Maxam Fund, the counterparty risk was borne by the Maxam Fund, itself, rather than Madoff, the broker dealer, even though BLMIS was choosing the counterparty on behalf of the Maxam.  The Trustee alleged, upon information and belief, that the Maxam Defendants did not know the counterparties to these transactions and never attempted to seek them out.   According to the  Trustee's Complaint, the Maxam Defendants' conduct in this regard contradicts representations made by Maxam Capital in the December 2005 due diligence questionnaire submitted to the Alternative Investment Management Association "AIMA," in which Maxam Capital stated that "[w]hen MAXAM establishes a fund of funds, each sub-advisor's documents are analyzed to be sure that they

clearly explain the manager's strategy, including approved counterparties, markets, instruments, and specific trading policies for the fund."[3]

94.     Additionally, the options trades were inconsistent with Madoff's representations regarding options trading.  For example, as described in the Madoff Trustee's complaint, even though the options were apparently done in the OTC market, where the counterparty will typically be listed and identified on the trade confirmation, the trade confirmations received by the Maxam Fund did not identify the counterparties.  As noted below, the trade confirmations also bizarrely showed CUSIP identification numbers even though OTC options are typically not assigned CUSIPs, like trades conducted on the CBOE.  Also, to the extent options were exchange-traded options, rather than OTC transactions, the Madoff Trustee alleges that the trades should have settled at "T+1" – one business day after the trade date.  However, almost all of the options trades for the Maxam Fund were settled beyond that time frame.

95.     Essentially, the Maxam Defendants allowed their investors to be exposed to billions of dollars of potential losses were the counterparties to fail or break the trades.

**10.     BLMIS Customers Received Paper Trade Confirmations**

96.     Although Madoff was known as a pioneer in electronic trading platforms, BLMIS did not provide electronic trade confirmations to any of its customers, including the Maxam Fund.  As detailed in the Maxam Trustee's complaint, according to Defendant Manzke, during some visits to BLMIS when she worked at Tremont, Madoff would walk through the trading floor, to "show off his paperless trading floor."  Yet, the Maxam Fund received only paper

---

[3] AIMA is a global hedge fund and alternative investment industry association that produces due diligence questionnaires, which are used by members and institutional investors on AIMA's confidential database and are used for selecting managers and service providers.

confirmations via standard mail days after a trade was purportedly executed rather than having real-time electronic access to the trade confirmations. The Maxam Defendants deliberately disregarded this substantial warning sign.

97. The Maxam Defendants had to have reviewed all of the trade confirmations received from BLMIS. According to the Amended PPM, Maxam Capital, as the administrator of the Maxam Fund, was responsible for calculating the NAV of the Fund on a trade date basis, as of the end of the last business day of each calendar month or at such other time determined by the General Partner in its discretion. The General Partner, Maxam GP, was also responsible for calculating the NAV of the Maxam Fund. Moreover, Maxam Capital received fees that were calculated as a percentage of the NAV. As Maxam Capital collected lucrative fees from the Maxam Fund, it is evident that the Maxam Defendants necessarily reviewed the trade confirmations received from BLMIS and therefore knew of the numerous discrepancies contained therein.

### 11.   BLMIS's Trade Confirmations Contained Errors

98. The Maxam Defendants would have received trade confirmations on Madoff's options trades. Although Madoff claimed that his options trades were conducted in the private OTC market and not in the CBOE, the trade confirmations BLMIS sent to the Maxam Defendants showed CUSIP identification numbers for the options traded. This is erroneous because OTC options are private transactions that are not assigned a CUSIP number while options traded on the CBOE do have a CUSIP number.

### D.   The Maxam Defendants Breached Their Fiduciary Duties

99. As the Maxam PPMs state, "[l]imited [p]artners will have no right or power to take part in the management of the Partnership, nor in any decision with regard to the allocation

of management of the Partnership's assets."  Further, "[a]ll decisions with respect to the general management of the Partnership are made by the General Partner."

100.    Accordingly, Plaintiff and the other limited partners were completely dependent on the Maxam Defendants to fulfill their fiduciary duties to investigate all potential investment managers before retaining them and to continue monitoring such managers during their period of retention.

101.    Nonetheless, the Maxam Defendants, in breach of their fiduciary duties, failed to conduct due diligence on Madoff, who was the manager of 100% of the Fund's assets.  The Maxam Defendants instead relied on Madoff's reputation and his reported returns without conducting any independent investigation of Madoff or his operation, and/or an analysis of the trading strategies and investment returns reported by Madoff, which remained consistently high regardless of market conditions.

### E.    The Maxam Defendants Collected Hefty Fees Despite Their Utter Dereliction Of Fiduciary Duties

102.    Notwithstanding the Maxam Defendants' egregious conduct in failing to properly conduct due diligence and failing to ensure that the Maxam Fund's assets were invested in accordance with the provisions of the PPMs, instead of in a Ponzi scheme orchestrated by Madoff, the Maxam Defendants nevertheless collected lucrative management and administrative fees.

103.    In exchange for the Maxam Defendants' alleged investing expertise and due diligence, Maxam Capital received management fees of up to 0.083% of the NAV of each limited partner's capital account.  These management fees were assessed on a pro rata basis for a limited partner's actual period of ownership during a calendar month.  The annual rate is approximately one percent (1%).

104.    As set forth above, Maxam Capital, and earlier, MCML, provided administrative services to the Maxam Fund including, but not limited to, maintaining books and records with respect to the assets of the Maxam Fund entrusted to Madoff, including daily trading activity with respect to such assets, and reconciling those books and records with confirmations and statements received from Madoff or his affiliated entities.   By failing to identify and report inconsistencies between these records and publicly available pricing and volume information and Madoff's reported but fictitious results, among other things, Maxam Capital breached its duties to Plaintiff and the other limited partners of the Maxam Fund.   However, in exchange for Maxam Capital's and MCML's purported administrative services, it received administrative fees of 0.20% of the NAV of each limited partner's capital account.   The administrative fee was also assessed on a pro rata basis for a limited partner's actual period of ownership during a calendar month.

105.    As set forth above, Madoff did not charge standard management fees but only charged the Maxam Defendants a four-cent per share "brokerage commission" for each purported equity trade made in the investment adviser business customer accounts, and a $1 per option contract executed.   This compensation arrangement allowed the Maxam Defendants to keep more of the fees they collected from the Maxam Fund's investors than they could have had they invested Maxam's assets with a legitimate investment manager who charged typical management fees.

106.    The Siedle Affidavit submitted in the Fairfield Action stated that: "Maxam Capital, and its principal, [Sandra] Manzke, and affiliated companies, Maxam Capital GP, LLC and Maxam Capital Management Limited . . . *were all aware that Bernard L. Madoff was engaging in illegal conduct in connection with his purported money management operations*

*and intentionally chose to participate in and support Madoff's illegal conduct in order to reap enormous illicit financial benefits.*" Siedle Aff. ¶ 4 (emphasis added).

107.    Upon information and belief, Maxam Capital and MCML together collected in excess of $5.8 million in management and administrative fees in connection with the Maxam Fund's investments with Madoff.

### F.    Other Investment Professionals Who Conducted Due Diligence On Madoff Did Not Invest Or Stopped Investing With Madoff

108.    Numerous investment advisors, investment banks and pension funds that took the time and effort to conduct proper due diligence reviews of Madoff chose to not invest or not maintain their earlier investments in BLMIS.  The Maxam Defendants, however, intentionally chose to not conduct due diligence, and instead turned a blind eye to the warning signs that they saw about Madoff and acceded to his demands for absolute secrecy.  Investment managers who chose not to entrust their clients' funds to Madoff were not supernaturally prescient.  Reasonable due diligence was all that was required to expose the illusory nature of Madoff's returns.

109.    Concerns about Madoff were well publicized in sources that would have brought them to Defendants' attention.  As described above,  two May 2001 articles in *Barron's* and *MARHedge* both expressed skepticism regarding Madoff's ability to achieve his remarkably consistent returns using his purported strategy and described warning signs of potential fraud.

110.    Madoff was also the subject of constant SEC investigations – commenced in 1992, 2005, and 2007 – into the legitimacy of his business, and scrutinized by members of the investment community who understood that his business was suspect and could be a fraud.

111.    On August 31, 2009, the SEC Office of Inspector General issued a report entitled "Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme (the "SEC OIG Report"), in which the SEC reached the conclusion that its own earlier failure to detect Madoff's

fraud was inexcusable.  It found that SEC employees, had they properly examined the red flags and took basic steps to determine if Madoff was operating a Ponzi scheme, would have recognized the significance of the red flags that the investment professionals heeded, and would have discovered the fraud "well before Madoff confessed."

112.    The Report describes how many investment professionals, who conducted due diligence on Madoff using customary methods for conducting due diligence in the industry, determined that investing with Madoff was too risky given the existence of the myriad red flags. As the SEC OIG Report states, "[m]any of the private entities that conducted due diligence of Madoff and declined to invest with him because of significant red flags that arose during the routine review of his operations."

113.    One significant red flag, noted by many professionals throughout the financial industry, but deliberately ignored by the Maxam Defendants, was the impossibility of recreating Madoff's results based on an application of his strategy to publicly available information.

114.    As described in the SEC OIG Report, on November 7, 1999, Harry Markopolos wrote a letter (the "November 7 Letter") to the SEC which stated that: "Madoff Securities is the world's largest Ponzi Scheme."  Markopolos, who years before had worked for a rival firm, researched Madoff's stock-options strategy and, based upon publicly available information, was convinced that the results were phony.

115.    The very first red flag set forth in the November 7 Letter noted that Madoff's fee structure made no sense, because, while Madoff was running a hedge fund, he did not charge the standard fees a hedge fund would charge (1% management fee and 20% profits) and instead charged only a commission on the purported trades his company was making with investors'

money.  Regardless of whether the November 7 Letter was available to Merkin and GCC, they were aware of the issue and failed to conduct any meaningful investigation.

116.    Among the other 28 red flags raised by the November 7 Letter are:

(a)    The lack of transparency into BMIS, including Madoff's refusal to disclose his investment strategy;

(b)    Madoff's returns were abnormally smooth with very little volatility, including only five months of negative returns in the past 12 years;

(c)    The inability of other funds using a "split-strike conversion" strategy to generate returns even remotely comparable to those generated by Madoff;

(d)    Madoff acted as his own prime broker, while most hedge funds use large banks such as Goldman Sachs and Morgan Stanley as their prime brokers;

(e)    Monthly account statements sent to Madoff's investors did not support the returns they reported;

(f)    The exchanges upon which Madoff purportedly conducted options trades had insufficient volume to support such trades and the trades could not be independently verified or replicated;

(g)    BMIS was audited by a small accounting firm, unlike the majority of single strategy hedge funds that are audited by one of the top 10 audit firms; and

(h)    Madoff insisted the he and BMIS not be referenced in the offering materials which Plaintiffs and other members of the Class relied upon.

117.    If the Maxam Defendants had conducted the due diligence and risk management that they claimed, they would have confirmed the existence of each of these red flags.

43

118.    The SEC OIG Report described a statement given to them in an interview by Michael Ocrant, a financial journalist who authored the article entitled, "Madoff tops Charts; Skeptics Ask How." Ocrant described how he:

> gave the terms and strategies [utilized by Madoff] to a guy who ran a quantitative analysis with a Japanese bank for a Fund to funds they ran and I said can you take this data and can you – have you crunch it and let me know what you think and I didn't give any further information and I said this is the strategy. He got back to me like a week to 10 days later and he said, "Well, the team came back and they said this could be done by a market-maker, probably have to use front money to do it," and I said, "Oh, that's interesting," and I said, "What would you say if I told you this guy was managing maybe $5-6-7 billion?" He said, "Impossible. It has to be a Ponzi scheme."

119.    The SEC OIG Report describes how James Hedges, IV, who was the president and Chief Investment Officer of a global investment firm, viewed Madoff's uniformly positive results. He stated that that a "substantial red flag" was the "consistency of [Madoff's] returns that was not in keeping with the type of strategy that we understood him to be implementing because we felt that there were -- that the track record did not correlate to what we saw as either market factors, volatility factors, or other exogenous factors that would have otherwise affected the track record one way or another." The CEO of the research firm stated immediately he was "cynical" because, "The returns were impossible. Absolutely impossible in my opinion. No financial strategy could produce those sort of returns."

120.    The consistency of Madoff's results and superiority of Madoff's returns as compared to other investment managers was particularly eye-catching given that, as another fund manager, George Stahl, whose firm considered a Madoff feeder fund for a possible investment in 2005, stated, the strategy the Madoff feeder fund described "was a relatively common strategy." Mr. Stahl stated that he found this "odd." As described in the SEC OIG Report:

According to Stahl, the split-strike conversion strategy Madoff purportedly was using "usually produces a pretty consistent return," but in Madoff's case, the "level of consistency exhibited by [Madoff's] strategy relative to other strategies we knew that did similar things was much, much better." Stahl said that strategy worked well for several years, but in 2004 and 2005, because the "volatility levels in the market had fallen off so dramatically" the returns from that strategy fell off. Stahl said Madoff's "strategy has been around forever" and he knew of a mutual fund that adopted the same strategy, but while that mutual fund's returns got weaker as the overall market got weaker, Madoff's returns "remained very high."

121.    Another red flag causing many funds to avoid investing with BLMIS was that Madoff's market-based strategy reported impossibly consistent results despite market fluctuations.

122.    An unidentified CEO of a fund of funds, who was interviewed by the SEC during the course of its investigation into Madoff stated that:

> when it came to Madoff, "[m]arket's down, markets didn't really matter," explaining that "[y]ou can construct a strategy like that where you'll make money most of the time but you cannot construct a strategy where you make money all the time." The CEO said he had seen consistent strategies before, but "every once in a while, they trip up, while Madoff "didn't have that every once in a while."
>
> The CEO was suspicious and obtained copies of an investor's last few account statements from Madoff Securities, and compared a sample of trades on the statements with what was actually going on in the markets on the day Madoff was trading. The CEO stated he found this "pattern which really seemed weird where the -- where the purchases were all at or close to the lows of the day and the sales were at or close to the highs of the day," noting that "of course, nobody can do that." His "suspicion was that the fact pattern that [he] had seen seemed consistent with a Ponzi scheme." The CEO said he "didn't conclude that that was the case, but [he] certainly thought there was enough of a risk that that was the case that, you know, *[he] certainly wouldn't touch it with a 10-foot pole.*"

123.    Another red flag that caused many investment managers to keep clear of Madoff was that the numbers of OEX options he claimed to trade on a given day, frequently exceeded the total amount of such options that were traded that day on the CBOE, the only exchange trading those options.

124.    The SEC OIG Report discussed the decisions of the managers of certain funds of funds to avoid investing in Madoff and his feeder funds after observing this red flag:

> [One] registered fund of funds evaluated potential investments with Madoff feeder funds in 1998 and 2003. It considered an investment with Fairfield in 1998. As part of their standard due diligence process, the Hedge Fund Manager and his unidentified CIO met with Madoff. The CIO, a former options trader, pressed Madoff for information about his options trading. To the CIO's surprise, Madoff claimed to trade options through the Chicago Board of Options Exchange (CBOE). The CIO stated: "Well I found something exceptionally odd about that …. [I]mmediately what I asked Madoff was: How are you doing that? Because I don't think there's enough volume on the Chicago Board of Options Exchange for you to get that sort of coverage for the amount that you're managing."
>
> The CIO's suspicions triggered, he called CBOE to find out how much daily volume traded on the exchange. He described his call to CBOE, as follows: "And the problem is . . . that the volume was never there for Madoff. So that was problem No. 1 for me. Problem No. 2 was . . . I called up buddies of mine around the street who were now running the equity derivatives departments of a number of firms, and I asked them all if they were trading with Madoff. And nobody was. Nobody was doing these OEX options. And in fact, the funny part about it was they all said, yeah. You know, I hear that he's doing all these trades but, you know, we don't see it anywhere . . . And so things just began to, you know, not match up. And so for me, the biggest issue was – the biggest issue was the fact that I couldn't reconcile a big part of that strategy. And the information that was being told to me on the surface seemed to be false." Because of the unanswered questions, they passed on the investment.

125.    Investment Advisor Ivy Asset Management Corp. ("Ivy"), which had clients and, at one point, proprietary invested with Madoff also developed, early on, profound suspicions

concerning Madoff's legitimacy based on the OEX options red flag.  These crystallized no later than December 15, 1998, when at a meeting with Madoff, Ivy co-founder Simon Wohl ("Wohl") was given suspect explanations for how Madoff managed to trade OEX options in numbers significantly exceeding the total OEX options traded on the exchange.  The next day, Wohl recommended, in an email to Ivy's co-founder, Larry Simon, that Ivy no longer invest proprietary funds with Madoff, stating:

> I'm concerned that he [Madoff] now admits that he does not execute all of the index options on the exchange that there are 'unknown' counterparties that if these options are not paid off he'd lose less than 100% It remains a matter of faith based on great performance – this doesn't justify any investment, let alone 3%.

126.    In 2000, Ivy withdrew its proprietary funds from Madoff.  As Ivy's director of client development stated in a later email, "We used to use Madoff in our funds but elected to get out when we figured it was just too risky since we couldn't get our arms around how he does what he does."

127.    As detailed in the SEC OIG Report, the inability to verify Madoff's option trading was a major red flag to many potential investors:

> Many of the private entities that conducted due diligence of Madoff and declined to invest with him because of significant red flags that arose during the routine review of his operations felt that the SEC could have uncovered the fraud.  [One investor] thought a regulator could have verified whether Madoff was trading by asking Madoff who his counterparty was and then verifying with the counterparty that the trade took place. . . . [Another investor named] Broder would have performed the same verification process whether Madoff claimed his counterparty was in the United States or in Europe. . . .
>
> Broder explained his reasoning as follows:
>
> [S]omewhere in the marketplace, either in an exchange-traded marketplace or an OTC marketplace, exactly those trades which were on the client account statement should exist on someone

else's books, you know. . . Somewhere in the marketplace, either OTC or exchange-traded, those trades were taking place. And it seems to me a very simple set of steps to verify that those volumes [existed]. . . . I don't see how that could have possibly been missed. I mean, this is a very simple verification. I mean this guy is trading – this is a cash account. So he's turning over $10 billion of stocks each particular month. I mean, you've got to be [able to see it] in the marketplace.

...

[Another investor stated that if he] were investigating Madoff, he . . . would have asked Madoff to show me the other side of your trades whether he claimed to trade in the United States or Europe: "I need to see the other side of those trades in Europe. If they're in Europe, that's fine, but you're doing them with someone. There's got to be somebody on the other side of the trade."

128. An additional red flag was that Madoff self-custodied. A December 13, 2008 article in *The Wall Street Journal*, entitled "Redflags in Bernard Madoff's Alleged Ponzi Scam," quoted Chris Addy, founder of Castle Hall Alternatives and an investor in hedge funds, as follows:

There was no independent custodian involved who could prove the existence of assets... There's clear and blatant conflict of interest with a manager using a related-party broker-dealer. Madoff is enormously unusual in that this is not a structure I've seen.

129. Yet another red flag, which got attention in the financial community long before Madoff's Ponzi scheme crumbled, was Madoff's inexplicably low rates for his services. For example, as detailed in the SEC OIG Report, the portfolio manager for a Renaissance fund expressed concern in a November 13, 2003 email as to why Madoff was charging so little for his services: "not only are we unsure as to how [Madoff] makes money for us, we are even more unsure as to how [Madoff] makes money from us; i.e., why does [Madoff] let us make so much money?" Based on this and other red flags, Renaissance decided to withdraw all of its BLMIS investments in 2003.

130.    An article entitled "European Banks Tally Losses Linked to Fraud," published in *The New York Times* on December 17, 2008, stated, in relevant part, that "Société Générale…was not the only financial firm to think Mr. Madoff's unfailing record was too good to be true.…Madoff did not pass due diligence for many European hedge fund companies," Mr. Indjic said.  "Experienced people know there are many ways to provide the kind of return stream offered by Madoff, almost like a bank account, and one of them is a Ponzi scheme."

131.    Indeed, as far back as 2000, Credit Suisse warned its clients to pull their investments from Madoff, due to suspicions concerning his operations.

132.    By early 2007, the research department of Union Bancaire Privée, a Swiss bank, raised concerns about Madoff's legitimacy and recommended that Madoff be stricken from the list of managers with which UBP invested.

133.    As discussed above, Ivy, a major American investment manager, had significant concerns about Madoff no later than 1998, and withdrew proprietary funds from BLMIS in 2000. Over the years, Ivy insiders continued to express suspicions about Madoff.  In an e-mail dated April 1, 2002, for example, Wohl responded to a subordinate's attempt to analyze Madoff's consistent success by writing, "Ah, Madoff. You omitted one other possibility – he's a fraud!" positioning discussing whether Madoff should not be recommended to future clients, in a January 2003 e-mail, Wohl wrote, "Madoff (NOT)!"  Finally, in 2006, due to concerns about potential liability relating to Madoff, as to its pre-existing clients who had long been invested in Madoff, Ivy revised its consulting agreements, to expressly exclude Madoff from its scope of services which required it to research, monitor, evaluate and meet with outside managers.

49

134.    Similarly, Robert Rosenkranz, the principal of a major investment advisor to wealthy clients, Acorn Partners, was reported in the financial press to have stated that his firm's earlier due diligence of the Madoff firm, based in part on the abnormally stable and high investment returns claimed by Madoff and in part on inconsistencies between customer account statements and audited BMIS financial statements filed with the SEC, caused Acorn to conclude that it was highly likely that the BMIS account statements were generated as part of a fraudulent scheme.   An article entitled "Look Back at Wall St. Wizard Finds Magic Had Its Skeptics," published in *The New York Times* on December 12, 2008, quoted Mr. Rosenkranz, as stating:

> Our due diligence, which got into both account statements of his customers, and the audited statements of Madoff Securities, which he filed with the S.E.C., made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity.

135.    Simon Fludgate, head of operational due diligence at Aksia, another advisory firm, reported that it had concluded that Madoff was a fraud and, in 2007, advised clients not to invest with him.   Aksia had concluded that the stock holdings reported in the quarterly statements of BMIS filed with the SEC were too small to support the size of the assets Madoff claimed to be managing.   "There were no smoking guns, but too many things that didn't add up," Mr. Fludgate said.   The likely reason for this was publicly revealed on December 15, 2008, when investigators working at Madoff's offices determined that Madoff had been operating a secret, unregistered investment vehicle from his office.

136.    Simon Ruddick, the managing director of Albourne Partners, a London due diligence firm, has said that Albourne had steered its customers away from BLMIS for almost a decade.   A Fort Worth pension fund that received advice from Albourne voted unanimously to discontinue its investments in BLMIS in July 2008.

137.    Unlike the fund managers and other discussed above, the Maxam Defendants, who are investment professionals with decades of experience, failed to conduct even a rudimentary due diligence review, which, if conducted, would have alerted them to Madoff's scheme, or at least that he could not possibly achieve the returns he claimed.  As a result of this failure, the Maxam Defendants failed to give their clients the same basic and required protection afforded by all of the forgoing entities, and, thus, breached their fiduciary duties to the Maxam Fund's limited partners.

### G.    The Fairfield Action

138.    On March 30, 2009, the Retirement Program for Employees of the Town of Fairfield, Retirement Program for Police Officers and Firemen of the Town of Fairfield, and the Town of Fairfield (collectively, "Fairfield Plaintiffs"), as investors in the Maxam Fund, brought an action against several feeder funds, including the Maxam Defendants, and others in the Superior Court of the State of Connecticut: *Retirement Program for Employees of the Town of Fairfield, et al. v. Bernard L. Madoff, et al.*, FBT CV 095023735 (Conn. Sup. Ct.).

139.    On May 4, 2009, the Fairfield Action was transferred from Fairfield to Stamford-Norwalk (Index No. FST-CV09-5011561-S).   A third amended complaint, the operative complaint, was filed on May 6, 2011 and the Maxam Defendants filed an amended answer to that complaint on February 2, 2012.

140.    The Fairfield Action alleges, *inter alia*, that the Fairfield Plaintiffs first came into contact with Madoff through earlier investments with Tremont.  In or about April 2005, after Defendant Manzke started Maxam Capital, Manzke, acting on behalf of the other Maxam Defendants, approached the Fairfield Plaintiffs, taking advantage of her long-term personal relationship as their pension investment adviser, to solicit them to withdraw their investments in Tremont funds and purchase limited partnership interests in the Maxam Fund instead. The

Fairfield Action alleges that Defendant Manzke's conduct in forming Maxam Capital, and the Maxam Defendants' conduct in marketing the Maxam Fund, as well as their solicitation of the Fairfield Plaintiffs to purchase limited partnership interests in the Maxam Fund, was undertaken in concert with Madoff pursuant to his fraudulent scheme.

141.   Among other allegations of wronging, the Fairfield plaintiffs allege that the Maxam Defendants provided Fairfield with audited financial reports showing that the assets of the Maxam Fund were held in custody at Bank of America, Corp., when, in reality, its assets were kept in custody at BLMIS.

142.   In applying for a prejudgment remedy on October 23, 2013, Fairfield alleged that the Maxam Defendants had settled the Maxam Auditor Action for an undisclosed amount and that "[the Maxam Defendants] would not be distributing any portion of the settlement to the limited partners" but would instead use the settlement proceeds to fund their defense in the Trustee's Action.   Further noting that the Maxam Defendants were sparing no expense in litigation, Fairfield noted that counsel for the Maxam Defendants had revealed that at least 82% of the settlement proceeds from the Auditor Action had been distributed already and that a remaining $2 million of insurance coverage would also be used to fund their litigation costs in the Fairfield Action.

143.   On March 13, 2013, the Fairfield plaintiffs and Maxam Capital, Maxam GP, Maxam Limited, Sandra Manzke, Walker Manzke, and April Manzke jointly moved for entry of judgment because they entered into a $2.88 million settlement agreement (the "Fairfield Settlement Agreement").   The court granted the motion on March 15, 2013, and a judgment was entered on that same day.   Under the terms of the Fairfield Settlement Agreement, the Fairfield Plaintiffs will receive an initial sum of $250,000 from the Maxam Defendants.   Payment of the

remaining sum of approximately $2,630,860.00 is contingent and will be paid only "[i]n the event that [the Maxam Fund's] claim for reimbursement pursuant to the Securities Investor Protection Act ("SIPA") . . . is recognized or allowed in whole or in part or in the event [the Maxam Fund] receives money directly on account of its SIPA Claim or in settlement of the litigation over the SIPA Claim." If the contingency occurs, the Fairfield Plaintiffs will be paid the $2.63 million within five business days of the Maxam Fund receiving money from its SIPA Claim. However, if the Maxam Fund receives reimbursement from its SIPA claim that is less than the $2.63 million outstanding, the "Retirement Programs will be entitled to only those amounts received by [the Maxam Fund], and will not be entitled to any additional payment," according to the Settlement Agreement. Thus, all but $250,000 of the Maxam Defendants' liability under the Fairfield Settlement Agreement is entirely dependent on the Maxam Fund's SIPA Claim being allowed.

144. The Fairfield Settlement Agreement further provides that the Maxam Defendants may be indemnified for the contingent payment by the Maxam Fund, as set forth in the Investment Management Agreement between the Maxam Fund and its Investment Manager, Maxam Capital.

145. Further, according to the Fairfield Settlement Agreement, "[the Maxam Fund] agrees to satisfy this obligation to the Investment Manager as the first payment out of any funds received from [Maxam Fund's SIPA Claim]."

146. In short, the Fairfield Settlement Agreement provides that the Maxam Defendants may be fully indemnified for their liabilities to the Fairfield Plaintiffs and such indemnification receives first priority.

147.    Paying the Fairfield Plaintiffs anything other than their pro rata losses will unfairly dilute what other limited partners may recover; the Fairfield Plaintiffs, as limited partners of the Maxam Fund, were not preexisting creditors of the Fund.  Further, not only would this serve to dilute any damages that Plaintiff and the Class may hope to recover from the Maxam Defendants for their wrongdoing, but the money to extinguish the liability of Maxam Capital, Maxam GP, and Manzke, the primary wrongdoers, in the Fairfield Action will come from the assets of the Maxam Fund.  The Maxam Defendants, as the primary wrongdoers, should not be permitted to avail themselves of the Fund's assets for their own benefit.

**H.      The Madoff Trustee's Action**

148.    On December 8, 2010 the Trustee for the liquidation for BLMIS, filed a complaint in the United States Bankruptcy Court for the Southern District of New York (No. 08-01789 (BRL)) against the Maxam Fund, the Maxam Defendants, and others seeking more than $100 million (the "Trustee Action").

149.    The Trustee's Action complaint alleges, among other things, that the Maxam Defendants (and others) "buried their heads as they profited richly from Madoff's fraud and focused on their own personal gain, doing the very thing that Manzke had so vehemently criticized less than a month before the collapse of Madoff's Ponzi scheme."  While collecting in excess of $5.8 million in fees, the Maxam Defendants contributed to the perpetuation of the biggest Ponzi scheme in history.

150.    The Trustee alleges that the Maxam Defendants knew or should have known that they were profiting from fraud.  As explained in the Trustee's Complaint:

> Notwithstanding over a decade of investment management experience at Tremont, and purported financial expertise, [the Maxam] Defendants never questioned Madoff's returns showing consistent positive returns, even when the stock market suffered serious downturns due to the Russian market crisis in 1998, the

9/11 terrorist attacks, the burst of the Tech Bubble from 2001-2003, and the 2007-2008 collapse in the financial and housing markets. This is despite the Maxam Defendants' understanding that the Madoff strategy was supposedly tied, or correlated, to the overall direction of the equity markets.

151.   The Madoff Trustee seeks to recover, either directly from the Maxam Fund or from subsequent transferees, almost $100 million in avoidable transfers received by the Maxam Fund as well as $5.8 million in fees received by Maxam Capital, the $1.8 million Pound Ridge house which Manzke allegedly fraudulently transferred to her son, daughter-in-law, and a trust for their benefit, and Manzke's $500,000 withdrawal from the Maxam Fund to her IRA in 2008.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

152.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of itself and all those persons who were investors in the Maxam Fund during the Class Period (May 30, 2006 through December 11, 2008) and who suffered damages thereby.  Excluded from the Class are the Maxam Defendants, the officers and directors of the Maxam Defendants, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which the Maxam Defendants have or had a controlling interest.

153.   While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that the Class is so large that joinder of all members is impracticable.  Members of the Class may be identified from records maintained by Maxam Capital or Maxam GP and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

154.    Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of its claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

155.    The Class claims present common questions of law or fact that predominate over any questions affecting only individual members of the proposed Class, including:

(a)    Whether the federal securities laws were violated by the Maxam Defendants' acts as alleged herein;

(b)    Whether the Maxam Defendants made material misrepresentations or omitted to state materials facts during the Class Period;

(c)    Whether the Maxam Defendants acted with knowledge or with reckless disregard for the truth in misrepresenting and/or omitting material facts;

(d)    Whether the Maxam Defendants' conduct was intentional, reckless, and/or grossly negligent and/or in violation of fiduciary duties owed to Plaintiff and other Class members; and

(e)    To what extent the members of the Class have sustained damages and the proper measure of damages.

156.    The claims Plaintiff asserts herein are typical of the claims of each of the other Class members because, among other things, all Class members were comparably injured by the Maxam Defendants' wrongful conduct in violation of the federal and state laws described herein. Plaintiff is advancing the same claims and legal theories on behalf of itself and the other Class members and there are no defenses available to the Maxam Defendants that are unique to Plaintiff.

157.    Plaintiff is an adequate representative of the proposed Class because his interests do not conflict with the interests of the other Class members he seeks to represent; he has retained counsel competent and experienced in complex class action litigation; and Plaintiff and his counsel will prosecute this action vigorously.   The Class's interests will be fairly and adequately protected by Plaintiff and its counsel.

158.    This action is maintainable as a class action because the Maxam Defendants have acted on grounds generally applicable to the Class, thereby making final monetary, equitable and declaratory relief appropriate to the Class as a whole.

159.    Class action treatment here is superior to other available methods for the fair and efficient resolution of this controversy because:

(a)    Separate adjudication of claims by individual Class members could lead to inconsistent results, which would establish incompatible standards of conduct for the Maxam Defendants;

(b)    Separate actions by individual Class members could injure other Class members' ability to adequately protect their interests;

(c)    The financial burden on individual Class members would make it impracticable for them to pursue their claims against the Maxam Defendants individually; and

(d)    Judicial economy would be served by maintenance of this action as a class action to avoid numerous individual lawsuits filed by Class members.

160.    No unusual difficulties are anticipated in the management of this action as a class action.

## PLAINTIFF'S DERIVATIVE ALLEGATIONS

161.    Plaintiff brings this action derivatively in the right and for the benefit of the Maxam Fund to seek redress for the injuries suffered, and to be suffered, by the Maxam Fund as

a direct result of the violations alleged herein.   The Maxam Fund is named as a Nominal Defendant solely in a derivative capacity so that the limited partners of the Maxam Fund can obtain a recovery if the Maxam Fund recovers on its claims against the Maxam Defendants.

162.   Plaintiff will adequately and fairly represent the interests of the Maxam Fund and its limited partners in enforcing and prosecuting its rights.

163.   Plaintiff is a limited partner of the Maxam Fund and was a limited partner of the Maxam Fund at all times relevant to the Maxam Defendants' wrongful course of conduct alleged herein.

164.   This is not a collusive action to confer jurisdiction that the Court would otherwise lack.

165.   Plaintiff has not made any demand upon Maxam GP, the General Partner of the Maxam Fund, to bring an action on behalf of the Maxam Fund asserting the claims herein to recover damages for the injuries suffered by the Maxam Fund, since such demand would have been a futile, wasteful and useless act, and therefore is excused for the following reasons.

166.   Demand is excused because the unlawful acts and practices alleged herein cannot be defended by the Maxam Defendants, who controlled the Maxam Fund and are not subject to the protection of any independent business judgment.   Given the size, scope, and blatancy of the wrongdoing and the misrepresentations and omissions alleged above, the Maxam Defendants either knew of the financial risks to the Maxam Fund's assets or recklessly turned a willful blind eye to them. Such conduct is not protected by the business judgment rule and exposes the Maxam GP, as well as Maxam Capital and Manzke, to a substantial threat of liability in this action.   Since the Maxam Fund has been wiped out by the Maxam Defendants investment of 100% of the Fund's assets in Madoff, it would undoubtedly be to the benefit of the Maxam Fund

to recover the damages caused by the Maxam Defendants' wrongdoing and to assert these derivative claims.

167.   Demand is further excused because the wrongs alleged herein constitute violations of the fiduciary duties owed by the Maxam Defendants to the Maxam Fund and its limited partners, and these acts are incapable of ratification.   The Maxam Defendants are subject to liability for breaching their fiduciary duties to the Maxam Fund and for abrogating their duty of oversight since, among other things, the Maxam Defendants knew the Maxam Fund's assets were entirely invested with Madoff, knew they were not conducting adequate, if any, due diligence or monitoring of Madoff, and knew or were extremely reckless in not knowing that Madoff was engaging in fraud or, at a minimum, was reporting results that were impossible to achieve pursuant to Madoff's split-strike conversion strategy or otherwise.   Yet, the Maxam Defendants took no steps to prevent or remedy that situation, proximately causing millions of dollars of losses to the Maxam Fund and its investors.

168.   As alleged herein, the Maxam Defendants were active wrongdoers, where they themselves actually committed the wrongdoing.   The Maxam Defendants promised investors they would conduct due diligence on their broker dealers; the Maxam Defendants knew no one was actually performing such due diligence on Madoff; and the Maxam Defendants chose, nonetheless, both to continue investing the Maxam Fund's clients' money with Madoff and not disclose to them the lack of due diligence.   Therefore, demand is excused because the Maxam Defendants cannot investigate and prosecute these claims against themselves, since they cannot objectively consider whether to sue themselves.

169.   Demand is excused on Maxam GP, as General Partner of the Maxam Fund, because it suffers from irreconcilable conflicts.   This Complaint alleges wrongdoing by Maxam

GP.   Under the LPA, Maxam GP exercises ultimate authority over the Partnership and is responsible for the day-to-day operations of the Partnership.  Because the Limited Partners have no authority or right to act on behalf of the Partnership in connection with any matter relating to the management of the Partnership, Maxam GP was obligated to exercise its fiduciary duties and act in the Partnership's best interests.  Given Maxam GP's exposure to liability from the conduct described herein, including its intentional and bad faith breaches of fiduciary duty, Maxam GP cannot independently consider whether to bring claims against itself of its own misconduct.

170.   Demand is also excused because Maxam GP exercises authority over the Maxam Fund and designated its affiliate Maxam Capital, to act as the investment manager and administrator of the Fund.  Maxam Capital profited at the expense of the Maxam Fund because Maxam Capital received management, administrative and other fees from the Maxam Fund of up to $5.8 million.  Consequently, Maxam GP would be suing its own affiliate to recover fees it arranged for the Fund to pay to the affiliate.

171.   This Complaint also alleges wrongdoing by Maxam Capital (and MCML), and Manzke.  Any action by Maxam GP against these other Maxam Defendants is tantamount to initiating litigation against itself.  Maxam GP has ratified the egregious misconduct of Maxam Capital and Manzke, and, therefore, cannot be expected to prosecute claims against Maxam Capital and Manzke, with whom it is inextricably intertwined, if Plaintiff demanded that it do so.

172.   Demand is excused because Defendant Manzke controlled Maxam GP, Maxam Capital, and the Maxam Fund, and is an owner of Maxam GP and an owner, Chairman and CEO of Maxam Capital.

173.   Defendant Manzke is identified in the LPA as one of the principal decision makers within Maxam Capital with regard to the Maxam Fund.  According to the Form ADV, as

part of the investment management team at Maxam Capital, Manzke participated in all aspect of manager research and due diligence.  Accordingly, she exercised considerable authority over the Maxam Fund and profited at the expense of the Maxam Fund, both as an owner of Maxam GP and Maxam Capital and as an employee of Maxam Capital.

174.    Demand is also excused because Defendant Manzke was a primary wrongdoer and therefore faces significant personal liability.  Defendant Manzke had a personal relationship with Madoff, and she was one of the first trusted investment managers to form a fund specifically to invest with Madoff.  In particular, Manzke faces substantial liability because she decided to invest all of the Maxam Fund's assets with Madoff without disclosing it in the Maxam Fund's PPMs, published PPMs with the material misrepresentations and omissions alleged here, knowingly and intentionally, and violated her fiduciary duties.  Through her personal and long-standing relationship with Madoff, Manzke knew or should have known that there were serious questions surrounding the legitimacy of Madoff's trading operations and his purported results, or that Madoff's generated purported results would have been impossible to achieve under his alleged investment strategy, and yet, Manzke took no steps in a good faith effort to prevent or remedy that situation, proximately causing million of dollars of losses and the decimation of the fund she created, the Maxam Fund.

175.    The acts complained of constitute violations of the fiduciary duties owed by the Maxam Defendants and these acts are incapable of ratification.

176.    Maxam GP lacks sufficient independence to make a disinterested decision as whether to pursue the derivative claims alleged herein against the Maxam Defendants.

177.    Demand is also excused because the exculpatory provisions in the Maxam Fund's PPMs with respect to Maxam GP, as the General Partner, and its "Affiliates" (which include

Maxam Capital, MCML and Manzke), do not offer protection where, as here, the actions at issue constitute gross negligence, dishonesty or bad faith. Moreover, that exculpatory provision protects Maxam GP and its Affiliates from liability for the wrongdoing of agents retained by Maxam GP or the Maxam Fund (*i.e.*, Madoff), only where such persons were selected, engaged or retained with reasonable care – which is not the case here.

178.    Demand is also excused because courts have found demand futility and upheld various derivative claims in other cases against managers of Madoff feeder funds (like the Maxam Fund), on grounds that are equally applicable to the Maxam Defendants. For example, in *Hecht v. Andover Assoc. Mgmt. Corp.*, 006110/09, 2009 New York Slip Op. 50528(U) (N.Y. Sup. Ct. Apr. 1, 2009), the court refused to dismiss derivative gross negligence and other claims that are similar to those asserted by Plaintiff here. *See also Sacher v. Beacon Assoc. Mgmt. Corp.*, 005424/09, 2010 New York Slip Op 50826(U) (N.Y. Sup. Ct. Apr. 26, 2010) (refusing to dismiss derivative gross negligence and negligence claims). In addition, in *Anwar v. Fairfield Greenwich Ltd.*, No. 09 Civ. 118 (VM), 2010 U.S. Dist. LEXIS 86716 (S.D.N.Y. Aug. 18, 2010), the court upheld direct claims against the managers of funds, who are in similar positions as the Maxam Defendants, and knowingly invested fund assets with Madoff.

179.    The Maxam Fund has been directly and substantially injured by reason of the Maxam Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Maxam Fund. Plaintiff, as a limited partner and representative of the Maxam Fund, seeks damages and other relief for the Maxam Fund, in an amount to be proven at trial.

**CLAIMS ALLEGED**

**COUNT I**
**Violation of Section 10(b) of the Exchange Act and**
**Rule 10b-5 of the Securities and Exchange Commission**
**(Against the Maxam Defendants)**

180.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

181.   This Count is asserted against all the Maxam Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder.

182.   During the Class Period, the Maxam Defendants directly engaged in a common plan, scheme, and unlawful course of conduct, pursuant to which they knowingly or recklessly engaged in acts, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class, and made various deceptive and untrue statements of material fact and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiff and the other members of the Class.  The purpose and effect of the scheme, plan, and unlawful course of conduct was, among other things, to induce Plaintiff and the other members of the Class to purchase limited partnership interests in the Maxam Fund.

183.   During the Class Period, the Maxam Defendants, pursuant to said scheme, plan, and unlawful course of conduct, knowingly and recklessly issued, caused to be issued, participated in the issuance of, and the preparation of deceptive and materially false and misleading statements to Plaintiff and the other Class members as particularized above.

184.   In ignorance of the false and misleading nature of the statements described above and the deceptive and manipulative devices and contrivances employed by the Maxam

Defendants, Plaintiff and the other members of the Class relied, to their detriment, on such misleading statements and omissions in purchasing limited partnerships in the Maxam Fund.

185.    By reason of the foregoing, the Maxam Defendants directly violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class in connection with their acquisitions of limited partnership interests in the Maxam Fund.

186.    As a direct and proximate result of the Maxam Defendants' wrongful conduct, Plaintiff and other members of the Class suffered substantial damages in connection with their purchases of limited partnership interests in the Maxam Fund in an amount to be proven at trial.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**(Against Defendants Maxam Capital and Manzke)**

187.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

188.    Defendants Maxam Capital and Manzke acted as controlling persons of the Maxam Fund within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their ownership, high level positions, participation in and/or awareness of the day-to-day operations, and/or intimate knowledge of the Maxam Fund's products, sales, accounting, selection of investment advisors and managers, plans and implementation thereof, they had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Maxam Fund, including the content and dissemination of the various statements

that Plaintiff contends are false and misleading.  Defendants Maxam Capital and Manzke had the ability to prevent the issuance of these statements or cause these statements to be corrected.

189.    Defendants Maxam Capital and Manzke also had direct and supervisory involvement in the day-to-day operations of the Maxam Fund and, therefore, are presumed to have had the power to control or influence the particular statements giving rise to the securities violations alleged herein, and exercised the same.

190.    By virtue of their positions as controlling persons, Defendants Maxam Capital and Manzke are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of their wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their acquisitions of limited partnership interests in the Maxam Fund in an amount to be proven at trial.

## COUNT III
## Common Law Fraud
## (Against the Maxam Defendants)

191.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

192.    Plaintiff and other members of the Class, in reasonable and justifiable reliance upon the statements, misrepresentations and omissions made by the Maxam Defendants, as previously set forth herein, purchased limited partnership interests in the Maxam Fund.

193.    Plaintiff and other members of the Class would not have purchased their limited partnership interests in the Maxam Fund except for their reliance upon the representations made by the Maxam Defendants, and would not have purchased them had they been aware of the material omissions and concealment by the Maxam Defendants that 100% of the Maxam Fund's

assets were placed with Madoff, that the Maxam Defendants conducted inadequate, if any, due diligence, and failed to truly monitor the Maxam Fund's investments and Madoff.

194. At the time of these statements, misrepresentations and omissions, the Maxam Defendants knew or should have known them to be false and intended to deceive Plaintiff and other members of the Class by making such statements, misrepresentations, and omissions in the Maxam Fund's PPMs and other offering documents.

195. At the time of the false statements, misrepresentations and omissions set forth above, each of the Maxam Defendants intended that Plaintiff and other members of the Class would act on the basis of the statements, misrepresentations and omissions contained in the Maxam Fund's PPMs and other documents provided to limited partners in determining whether to purchase limited partnership interests in the Maxam Fund. Plaintiff and other Class members reasonably relied thereon to their detriment in making such decisions.

196. Had Plaintiff and other members of the Class known of the material facts that the Maxam Defendants wrongfully concealed and misrepresented, and the falsity of the Maxam Defendants' representations, Plaintiff and other Class members would not have purchased their limited partnership interests in the Maxam Fund.

197. Plaintiff and other members of the Class, as a result of their purchases of limited partnership interests in the Maxam Fund and by reason of the Maxam Defendants' material misrepresentations and omissions, have sustained damages, suffered mental and emotional distress and have lost a substantial part of their investments in an amount yet to be determined, and to be proven at trial.

198. By reason of the foregoing, the Maxam Defendants are jointly and severally liable to Plaintiff and other Class members.

## COUNT IV
### Negligent Misrepresentation
### (Against the Maxam Defendants )

199.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

200.    The Maxam Defendants owed to Plaintiff and other Class members a duty: (a) to act with reasonable care in preparing and disseminating the Maxam Fund's PPMs and other documents, including monthly account statements, which were relied upon by Plaintiff and other Class members in deciding to purchase and/or retain their limited partnership interests in the Maxam Fund; and (b) to use reasonable diligence in determining the accuracy of and preparing the information contained in the Maxam Fund PPMs, monthly statements, and other materials.

201.    The Maxam Defendants breached their duties to Plaintiff and other Class members by failing to investigate, confirm, prepare and review with reasonable care, the information contained in the Maxam Fund's PPMs, as well as in the monthly Investor Statements.

202.    Neither the Maxam PPMs nor any other offering material used in soliciting investments in the Maxam Fund, monthly Investor Statements, or other materials provided to the limited partners ever disclosed that all of Maxam's assets were ultimately invested with Madoff.

203.    Moreover, the Maxam PPMs contained the misrepresentation that the Maxam Fund's assets would be diversified such that at all times, no more than 20% of the value of the Maxam Fund's total assets would be invested in the securities of any one issuer.  But, as set forth above, the Maxam Defendants simply handed over 100% of Maxam's assets to Madoff, and, because they failed to conduct little, if any, due diligence or oversight of Madoff, they had no way of knowing whether Madoff was complying with this 20% diversification obligation.

204.     As a direct, foreseeable and proximate result of this negligence, Plaintiff and the other members of the Class relied, to their detriment, on such misrepresentations, and have sustained damages, suffered mental and emotional distress and lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

205.     Plaintiff and the other members of the Class relied, to their detriment, on such misleading statements and omissions in purchasing limited partnerships interests in the Maxam Fund.  Plaintiff and the other members of the Class have suffered substantial damages as a result of the wrongs alleged herein in an amount to be proven at trial.

206.     By reason of the foregoing, the Maxam Defendants are jointly and severally liable to Plaintiff and other Class members.

**COUNT V**
**Breach of Fiduciary Duty**
**(Against the Maxam Defendants)**

207.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

208.     The Maxam Defendants owed and owe Plaintiff and the Class fiduciary obligations.  By reason of their fiduciary relationships, the Maxam Defendants owed and owe Plaintiff and the Class the highest obligation of good faith, fair dealing, loyalty and due care.

209.     As a result of the Maxam Defendants' abrogation of their duties in the management and protection of the assets of the Maxam Fund for the benefit of its limited partners, as well as participation, exploitation and perpetration of the wrongdoing, as alleged herein, the Maxam Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to Plaintiff and the Class.  They

acted in bad faith, with gross negligence and with complete disregard of their obligation to use due care, and employ reasonable and prudent investment standards.

210.   As a proximate result of the Maxam Defendants' bad faith breaches of their fiduciary duties, Plaintiff and the other Class members have sustained damages, and have lost a substantial part of their respective investments in an amount yet to be determined, and to be proven at trial.

211.   By reason of the foregoing, the Maxam Defendants are liable to Plaintiff and other members of the Class.

**COUNT VI**
**Gross Negligence and Mismanagement**
**(Against the Maxam Defendants)**

212.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

213.   As the General Partner of the Maxam Fund, and investment manager and administrator of the Maxam Fund, with absolute control over its assets, the Maxam Defendants had a special relationship with Plaintiff and the members of the Class that gave rise to a duty to exercise due care in the management of the assets invested in the Maxam Fund, and in the selection and monitoring of third-party managers, such as Madoff.

214.   The Maxam Defendants knew or should have known that the Maxam Fund's limited partners were relying on them to manage the investments entrusted to them with reasonable care and that investors reasonably and foreseeably relied on them to exercise such care by entrusting assets to them.

215.   The Maxam Defendants owed fiduciary duties to Plaintiff and the Class to conduct, manage and supervise the Maxam Fund's investments in good faith and with due care

an in accordance with the stated investment strategies.   As set forth above, the Maxam Defendants breached their fiduciary duties to the Maxam Fund by acting in bad faith and failing to exercise due care in the performance of their duties.

216.    The Maxam Defendants should have prevented, through the exercise of reasonable diligence, the improper investing of all of the Maxam Fund's assets solely with Madoff.

217.    The Maxam Defendants authorized, approved, participated in, failed to disclose, and improperly concealed the improper conduct described herein.

218.    Plaintiff and the Class relied to their detriment on the Maxam Defendants to discharge their duties, as the General Partner, the investment manager and administrator of the Maxam Fund, and head of the Maxam Fund's Investment Committee, in a careful and prudent manner.

219.    As a direct and proximate result of the gross negligence and misconduct of the Maxam Defendants, Plaintiff and the Class have been harmed.   The Maxam Defendants are liable to Plaintiff and the Class in an amount yet to be determined, and to be proven at trial.

### COUNT VII
### Unjust Enrichment
### (Against The Maxam Defendants)

220.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

221.    As a result of the misconduct alleged herein, the assets of the Maxam Fund have been wiped out, and consequently, Plaintiff's and the other Class members' investments have been decimated.

222.    The Maxam Defendants were unjustly enriched at the expense of Plaintiffs and other members of the Class through the payment of management fees, administrative fees, and other remuneration.   Management and administrative fees were paid for services that were not provided and were based on the false NAVs and investment returns of the Maxam Fund.

223.    The performance of the Maxam Defendants was so far below the fiduciary, business and professional standards that Plaintiffs and the Class involuntarily conferred a benefit upon these Defendants without receiving adequate benefit or compensation in return.   These Defendants have been unjustly enriched.

224.    Equity and good conscience require that the Maxam Defendants disgorge to Plaintiff and the Class all management fees, administrative fees and other remuneration in an amount to be proven at trial.

## COUNT VIII
### Derivative Claim for Breach of Fiduciary Duty
### (Against the Maxam Defendants)

225.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

226.    The Maxam Defendants owed and owe the Maxam Fund fiduciary obligations. By reason of their fiduciary relationships, the Maxam Defendants owed and owe the Maxam Fund the highest obligation of good faith, fair dealing, loyalty and due care.

227.    As a result of the Maxam Defendants' abrogation of their duties in the management of Maxam's assets, as alleged herein, the Maxam Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith, and supervision owed to the Maxam Fund.   They acted in bad faith, with gross negligence and with complete

disregard of their obligation to use due care, and employ reasonable and prudent investment standards.

228.    As a proximate result of the Maxam Defendants' bad faith breaches of their fiduciary duties, the Maxam Fund has sustained damages and has lost its value.

229.    By reason of the foregoing, the Maxam Defendants are liable to the Maxam Fund in an amount yet to be determined, and to be proven at trial.

## COUNT IX
### Derivative Claim for Gross Negligence and Mismanagement
### (Against the Maxam Defendants)

230.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

231.    The Maxam Defendants owed fiduciary duties to the Maxam Fund to conduct, manage and supervise the Fund's investments in good faith and with due care an in accordance with the stated investment strategies.  As set forth above, the Maxam Defendants breached their fiduciary duties to the Maxam Fund by acting in bad faith and failing to exercise due care in the performance of their duties.

232.    The Maxam Defendants should have prevented, through the exercise of reasonable diligence, the improper investing of all of the Maxam Fund's assets solely with Madoff.

233.    The Maxam Defendants authorized, approved, participated in, failed to disclose, and improperly concealed the improper conduct described herein.

234.    The Maxam Fund relied to its detriment on the Maxam Defendants to discharge their duties, as the General Partner, the investment manager and administrator of the Maxam Fund, and head of the Maxam Fund's Investment Committee, in a careful and prudent manner.

235.    As a direct and proximate result of result of the gross negligence and misconduct of the Maxam Defendants, the Maxam Fund has been harmed.   The Maxam Defendants are liable to the Fund in an amount yet to be determined, and to be proven at trial.

## COUNT X
## Derivative Claim for Unjust Enrichment
## (Against the Maxam Defendants)

236.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs, as if fully set forth herein.

237.    As a result of the misconduct alleged herein, the assets of the Maxam Fund have been wiped out. The Maxam Defendants were unjustly enriched at the expense of the Maxam Fund through the payment of management fees, administrative fees, and other remuneration. Management and administrative fees were paid for services that were not provided and were based on the false NAVs and investment returns of the Maxam Fund.

238.    The performance of the Maxam Defendants was so far below the fiduciary, business and professional standards that the Maxam Fund involuntarily conferred a benefit upon these Defendants without receiving adequate benefit or compensation in return.   These Defendants have been unjustly enriched.

239.    Equity and good conscience require that the Maxam Defendants disgorge to the Maxam Fund all management fees, administrative fees and other remuneration in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A. Declaring this action to be a proper class action and certifying Plaintiff as the Class Representative under Rule 23 of the Federal Rules of Civil Procedure, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Plaintiff and the other Class members against the Maxam Defendants, jointly and severally, for all losses and damages sustained as a result of the wrongdoing alleged herein, together with pre-judgment and post-judgment interest thereon;

C. Awarding compensatory damages in favor of the Maxam Fund against the Maxam Defendants, jointly and severally, for all losses and damages sustained as a result of the Maxam Defendants' wrongdoing alleged herein, together with pre-judgment and post-judgment interest thereon;

D. Awarding punitive damages in favor of Plaintiff and the other Class members for the Maxam Defendants' willful and wanton acts, together with pre-judgment and post-judgment interest thereon;

E. Imposing a constructive trust upon the proceeds of the Maxam Fund's SIPA Claim and any funds remaining in the Maxam Fund;

F. Granting equitable injunctive relief enjoining or otherwise restricting the proceeds of the Maxam Fund's SIPA Claim and any assets of the Maxam Fund from being used to pay for any portion of the Fairfield Settlement, to indemnify the Maxam Defendants for their liabilities under the Settlement Agreement with the Town of Fairfield, or to cover their attorneys' fees, costs or other expenses of litigations, and from collecting accrued fees or other remuneration from the Maxam Fund, so as to assure Plaintiff and the Class have an effective remedy;

G.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

H.     Granting such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Pursuant to Federal Rule of Civil Procedure 38(a), Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  June 17, 2013

                                    WOLF HALDENSTEIN ADLER
                                    FREEMAN & HERZ LLP

                                    By:  _____
                                         Daniel W. Krasner (DK-6381)
                                         Demet Basar (DB-6821)
                                         Maja Lukic
                                         270 Madison Avenue
                                         New York, New York 10016
                                         Telephone: (212) 545-4600
                                         Facsimile: (212) 545-4653

/721375

## PLAINTIFF'S CERTIFICATION

William Manno ("Plaintiff") declares under penalty of perjury, as to the claims asserted   under the federal securities laws, that:

1.           I have reviewed the Amended Class Action and Derivative Complaint (the "Complaint") and authorized the commencement of an action on Plaintiff's behalf and on behalf of the class specified in the Complaint.

2.           I did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

3.           I am willing to serve as a representative party on behalf of the class including providing testimony at deposition and trial, if necessary.

4.           My purchases in Maxam Absolute Return Fund, L.P., during the class period specified in the Complaint are as follows:

| Date | Purchase |
|---|---|
| May 25, 2007 | $200,000 |
| February 6, 2008 | $200,000 |
| August 29, 2008 | $75,000 |

5.           During the past three years, I have not served as a representative party for a class in an action filed under the federal securities laws, nor have I made an application to serve in that capacity.

6.           I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as may be ordered by the court.

7.           I declare under penalty of perjury that the foregoing is true and correct.

Executed this 11 day of June, 2013.

_____
William Manno

## **VERIFICATION**

I, William Manno, hereby verify that I am a limited partner of Maxam Absolute Return Fund, L.P., that I am familiar with the allegations in the Amended Class Action and Derivative Complaint (the "Complaint"), and that I have authorized the filing of the Complaint. Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief. I declare under the penalty of perjury that the foregoing is true and correct.

Dated: June 11, 2013

_____
William Manno

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2013, I caused the foregoing Amended Class Action and Derivative Complaint to be served upon the parties below, by securely depositing a true and correct copy thereof in a postpaid wrapper in a depository regularly maintained and exclusively controlled by the United States Government in the Borough of Manhattan, City, County, and State of New York:

        Carrie A. Tendler
        Jonathan D. Cogan
        Michael Sangyun Kim
        Kobre & Kim LLP
        800 Third Avenue, 6th Floor
        New York, NY  10022

        *Attorneys for Defendants*

        Maja Lukic

/721042